UNITED STATES of America,
Plaintiff-Appellee,

v.

Howard MECHANIC, Defendant-
Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Lawrence KOGAN, Defendant-Appellant.

Nos. 71–1022, 71–1117.

United States Court of Appeals,
Eighth Circuit.

Dec. 22, 1971.

Rehearing and Rehearing En Banc
Denied Jan. 13, 1972.

Louis Gilden, St. Louis, Mo., for appellants.

Jerry J. Murphy, Asst. U. S. Atty., St. Louis, Mo., for appellee.

David A. Lander, University, Mo., for American Civil Liberties Union of Eastern, Mo., for amicus curiae.

Before VAN OOSTERHOUT, HEANEY and ROSS, Circuit Judges.

HEANEY, Circuit Judge.

The defendants, Howard Mechanic and Lawrence Kogan, bring direct appeals from their convictions by juries for violation of 18 U.S.C. § 231(a) (3), one of the anti-riot provisions of the Civil Obedience Act of 1968. Mechanic was sentenced to five years in the custody of the Attorney General; Kogan was sentenced under the provisions of 18 U.S.C. § 4208(b).

Although the defendants were tried separately, substantially the same witnesses were produced and the same evidence adduced at each trial.

The evidence showed that on the evening of May 4, 1970,[1] a protest demonstration took place on the campus of Washington University, St. Louis County, Missouri. Following this demonstration, a large number of protesters marched to the vicinity of the campus's Air Force and Army R.O.T.C. buildings. Estimates of the size of the crowd at

---

1. The demonstration was in protest of the killing of four college students by National Guardsmen on the campus of Kent State University in Ohio, which had occurred earlier in the day.

the R.O.T.C. buildings ranged from one hundred to three thousand persons; most estimates were between five hundred and one thousand demonstrators. The demonstrators began throwing stones at the R.O.T.C. buildings.

Shortly after midnight, a fire, which had apparently been set, broke out in the Air Force R.O.T.C. building. A fire truck came to the scene, but retreated from the area of the fire under an intense barrage of rocks, bottles, and other items thrown by the crowd. A second fire truck met the same fate and also retreated.

Shortly after midnight, a third fire truck came on the scene. Fifteen St. Louis County Police Officers arrived and formed a protective line between the firemen and the demonstrators. The police were dressed in riot gear and were easily identifiable as law officers. Nevertheless, the fire truck, the firemen, and the police officers were continually subjected to a barrage of bricks, stones, glass, and cherry bombs. One police officer was slightly injured when struck by debris from an explosion. The third fire truck eventually extinguished the blaze in the R.O.T.C. building at around 1:00 A. M. on May 5.

A Washington University Law School student, Donald Bird, stood about five or six feet from the defendant Howard Mechanic at the height of the fire. He testified that he saw Mechanic propel a cherry bomb in the direction of the police line and saw it explode at or about the knee level of one of the patrolmen. Bird also testified that he saw Lawrence Kogan, standing a few feet from Mechanic, throw a cherry bomb which exploded five or six feet from a police officer.

The evidence clearly established that many persons committed acts of violence during the late night and early morning hours of May 4 and 5, 1970. In addition to the throwing of the previously described objects and the burning of the Air Force R.O.T.C. building, the Army R.O.T.C. building was ransacked. At least one injured person was taken to

the hospital by ambulance. Several witnesses testified that they were injured or feared for their safety. There was no evidence that either of the defendants undertook any act of violence other than the throwing of the cherry bombs.

The defendants raise several issues on appeal. We consider them separately.

## CONSTITUTIONAL POWER OF CONGRESS TO ENACT 18 U.S.C. § 231(a) (3)

The statute under which the defendants were convicted reads:

"(3) whoever commits or attempts to commit any act to obstruct, impede, or interfere with any fireman or law enforcement officer lawfully engaged in the lawful performance of his official duties incident to and during the commission of a civil disorder which in any way or degree obstructs, delays, or adversely affects commerce or the movement of any article or commodity in commerce or the conduct or performance of any federally protected function—

"Shall be fined not more than $10,000 or imprisoned not more than five years, or both."

The defendants contend that this statute is invalid because it exceeds Congress's power under the Commerce Clause.

We need not determine whether Congress has power to reach the conduct involved in this case under the Commerce Clause, since the statute is also directed at such activity when it affects " * * * the conduct or performance of any federally protected function." The case was tried on the theory that the civil disorder affected a federally protected function, namely the R.O.T.C. program and the buildings housing it. We must determine whether, on this basis, Congress has power to punish the defendants' activities in this case. See, Griffin v. Breckenridge, 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971); United States v. Raines, 362 U.S. 17, 80 S.Ct. 519, 4 L.Ed.2d 524 (1960).

A federally protected function is defined by 18 U.S.C. § 232(3) as:

"* * * any function, operation, or action carried out, under the laws of the United States, by any department, agency, or instrumentality of the United States or by an officer or employee thereof * * *."

There is no question that the R.O.T.C. programs and their supporting facilities fall within the statutory definition of "federally protected function." Congress, pursuant to its constitutional power to raise armies, has created the R.O.T.C. programs, 10 U.S.C. § 2101 et seq., and Congress has the power to protect them from destruction. It has chosen to do so by assuring that persons, charged with protecting R.O.T.C. installations from destruction by fire, be permitted to perform their duties unimpeded.

## OTHER CONSTITUTIONAL QUESTIONS

The defendants contend that the statute under which they were convicted is unconstitutional in four additional ways:

(1) it violates the First Amendment in that it prohibits constitutionally protected speech;

(2) it is vague and overly broad;

(3) it does not require the government to prove criminal intent;

(4) it does not require the government to prove that the defendants had knowledge of the official status of the individuals against whom their acts, or attempted acts, were directed.

We consider these contentions in order.

### First Amendment

■ The short answer to the defendants' contention that the statute prohibits protected speech is that, as we read it, § 231(a) (3) has no application to speech, but applies only to violent physical acts.

The operative words of the statute are "whoever commits or attempts to commit any act to obstruct, impede, or interfere with any fireman or law enforcement officer * * *". Thus, the section applies only to a person who acts to impede, obstruct, or interfere with an official described in the statute. National Mobilization Com. to End War in Viet Nam v. Foran, 411 F.2d 934, 937 (7th Cir. 1969).

■ This Court stands ready to protect constitutionally guaranteed activities or conduct from interference by either the State or private individuals. We are willing to do so even though the conduct may be offensive to others. See, Action et al., Percy Green v. Rowland E. Gannon et al., 450 F.2d 1227 (1971). But the conduct involved here is not entitled to constitutional protection.

The First Amendment has not been extended to protect rioting, inciting to riot, or other forms of physical violence. National Mobilization Com. to End War in Viet Nam v. Foran, 297 F.Supp. 1, 4 (N.D.Ill.1968), aff'd 411 F.2d 934 (7th Cir. 1969). See, Cox v. Louisiana, 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965); Feiner v. New York, 340 U.S. 315, 71 S.Ct. 303, 95 L.Ed. 295 (1951); Chaplinsky v. New Hampshire, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942). Nor has it been construed to protect, as symbolic speech, the act of throwing cherry bombs at police officers and firemen. See, United States v. O'Brien, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968); Cameron v. Johnson, 390 U.S. 611, 88 S.Ct. 1335, 20 L.Ed.2d 182 (1968); Adderley v. Florida, 385 U.S. 39, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966).

The United States District Court for the Northern District of Illinois considered the argument that § 231(a) (3) and § 232, the accompanying definitional section, prohibit constitutionally protected free speech and reached the same result that we do here. National Mobilization Com. to End War in Viet Nam v. Foran, supra, at 297 F.Supp. 1, aff'd 411 F.2d 934.

*Is Section 232 Vague and Overly Broad?*

The defendants urge that the statute is vague and overly broad because the term "civil disorder" is inadequately defined. Under § 231(a) (3), the conduct charged in this case is unlawful only if the policeman or fireman was engaged in his duties incident to and during the commission of a "civil disorder". As defined by § 232,

"(1) The term 'civil disorder' means any public disturbance involving acts of violence by assemblages of three or more persons, which causes an immediate danger of or results in damage or injury to the property or person of any other individual."

The defendants maintain that a "public disturbance" may cover meetings, demonstrations, and other constitutionally protected activities. They cite cases in which statutes, which make criminal conduct constituting a "public disturbance," have been found unconstitutional on the grounds of vagueness and overbreadth. The essence of their argument is that

"* * * *Any* constitutionally protected expression of views in a speech, an assembly, a demonstration, which invokes that quality of 'hazardous freedom' described by the [Supreme] Court in Tinker [v. Des Moines School District, 393 U.S. 503, [89 S.Ct. 733, 21 L.Ed.2d 731] (1969)] and is, therefore, swept into the broad 'net' of the term 'public disturbance,' becomes the subject of criminal prosecution merely by having an assemblage of three or more persons who are present at the occasion participate in an 'act of violence' which may or may not result in actual damage or injury to a person or property. * * * *"* (Emphasis included.)

This argument misses the point.

First, as we pointed out in the preceding section, the statute does not purport to reach speech of any kind. It reaches only acts to impede, obstruct, or interfere with police officers and firemen. The crime set forth by the statute is not mere presence at a civil disorder, as the defendants assume, but an act committed during the course of such a disorder. The term "civil disorder" simply describes the environment in which the act must be committed in order to be subject to prosecution under § 231(a) (3).

■ Second, since the statute does not attempt to curtail speech the defendants may not challenge it as vague or overly broad if their own conduct may be constitutionally prohibited, since " * * one to whom application of a statute is constitutional will not be heard to attack the statute on the ground that impliedly it might also be taken as applying to other persons or other situations in which its application might be unconstitutional * * * ". United States v. Raines, *supra*, 362 U.S. at 21, 80 S.Ct. at 522 and cases cited therein. See, dissenting opinion of Mr. Justice White in Coates v. City of Cincinnati, 402 U.S. 611, 91 S.Ct. 1686, 29 L.Ed.2d 214 (1971).

Third, the term "public disturbance" has not been used by the Congress in isolation. Rather, its scope is consistently narrowed by each subsequent phrase of the definition of "civil disorder." Thus, it is not just *any* public disturbance which is the subject of the section, but only public disturbances which (1) involve acts of violence (2) by assemblages of three or more persons, and which (3) cause immediate danger of or result in injury to (4) the property or person of any other individual.[2]

2. The defendants contend that § 232 should be held unconstitutional because it would permit a conviction in a situation where only one person commits an act of violence while part of an assemblage of three or more persons. We need not decide whether the statute covers the situation which the defendants postulate since it is clear that, in this case, more than three persons committed acts of violence. It is, therefore, unnecessary for us to decide the constitutional question raised by the defendants. See, United States v. Raines, 362 U.S. 17, 80 S.Ct. 519, 4 L.Ed.2d.524 (1960).

▉▉ A statute may not forbid the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application. Connally v. General Construction Co., 269 U.S. 385, 391, 46 S.Ct. 126, 70 L.Ed. 322 (1926). It will be found void for vagueness and overbreadth if it fails to give a person of ordinary intelligence fair notice that his conduct is forbidden by the statute. Palmer v. City of Euclid, 402 U.S. 544, 91 S.Ct. 1563, 29 L.Ed.2d 98 (1971). We think that § 232, read in conjunction with § 231(a) (3), is sufficiently clear that a normally intelligent person could ascertain its meaning and would be given fair notice of whether or not his conduct is forbidden under it.

The evidence established that acts of violence were committed by many persons assembled in the area of the R.O.T.C. buildings on the night of May 4 and 5. The statute thus clearly put the defendants on notice that their act of throwing cherry bombs at police and firemen engaged in extinguishing the R.O.T.C. fire was prohibited, so long as that act was committed during a "civil disorder."

### Intent

The defendants contend that the statute denies them due process because it does not specifically require that the government establish intent as an essential element of its case. We do not agree.

▉ The only judicial construction of § 231 has found that intent is an essential element of the offense.

" * * * It is true that Section 231 (a) (3) does not specifically refer to intent, but it only applies to a person who 'commits or attempts to commit any act to obstruct, impede, or interfere' with firemen or law enforcement officers. Under such phraseology, it will not be presumed that Congress intended strict liability for inadvertent or accidental occurrences where, as here, the crime is grounded on the common law. Morissette v. United States, 342 U.S. 246, 262–263, 72 S.Ct. 240, 96 L.Ed. 288 * * *." National Mobilization Com. to End War in Viet Nam v. Foran, supra at 411 F.2d 937.

We agree that § 231(a) (3) must be construed to require intent.

Furthermore, the indictment charged that the defendants acted with intent. The jury was instructed that, in order to convict, it must find that the defendants had acted with intent. We can only assume that, by returning a verdict of guilty, the jury concluded that the defendants had acted with intent.

### Knowledge of Official Status

The defendants argue that the statute does not require, nor did the government prove, that the defendants knew that the individuals at whom they threw the cherry bombs were either policemen or firemen.

▉ At Kogan's trial, the jury was instructed that an essential element of the offense was knowledge that the person at whom he threw the cherry bomb was a policeman or fireman. A similar instruction was requested by Mechanic, but it was refused. We feel it is preferable to follow the practice of the trial court in the Kogan case. But in his case, as in Mechanic's, the government proved that the police and firemen were in full uniform. Thus, we feel that knowledge of official status was sufficiently proved, and any failure to instruct on knowledge of official status was harmless to Mechanic. Furthermore, the defendants do not contend that they were unaware of the official status of the persons at whom they directed their missiles.

The Seventh Circuit has decided that knowledge of official status is not an essential element of the offense. National Mobilization Com. to End War in Viet Nam v. Foran, supra at 411 F.2d 934. We need not finally decide this question for ourselves since we think the evidence was sufficient to show that the

defendants had such knowledge in any event.[3]

## DOUBLE JEOPARDY ISSUE

The defendants argue that this prosecution violates the double jeopardy provisions of the Fifth Amendment.

Both defendants were convicted in state court of contempt of court for violating a temporary restraining order prohibiting activities which would interfere with the operation of the University or would damage the property of Washington University or other persons on its premises. The contempt convictions were based upon the acts of the defendants on the night of May 4 and 5, 1970. The defendants now contend that the subsequent federal prosecutions for the same acts violate the double jeopardy standard.

The defendants base this argument on their view that Waller v. Florida, 397 U.S. 387, 90 S.Ct. 1184, 25 L.Ed.2d 435 (1970) and Ashe v. Swenson, 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970), have undercut the holding[4] of Abbate v. United States, 359 U.S. 187, 79 S.Ct. 666, 3 L.Ed.2d 729 (1959).

We do not agree. Waller merely decided that, because of the identity of sovereigns, a state cannot prosecute a defendant for the same acts for which he has already been previously tried in a municipal court. The Supreme Court specifically reaffirmed Abbate in Waller. Ashe v. Swenson, supra, also involved dual state prosecutions for the same acts; thus it is not applicable to this case.

The Court recently held " *    *    * that the defense of double jeopardy does not bar successive prosecutions where *    *    * there is no identity of sovereigns *    *    * ", even where the same conduct is involved and the elements of proof in the two cases are identical. United States v. Synnes, 438 F.2d 764, 773 (8th Cir. 1971).

The defendants also argue that there was an abuse of prosecutorial discretion in that a memorandum from the Department of Justice would have prohibited the federal prosecution, following the state contempt prosecution, without the express approval of the Attorney General.[5] The evidence indicates that such approval was never obtained.

3. Several cases construing a similar statute, 18 U.S.C. § 111 (assault on a federal officer), have found knowledge of official status not to be an element of the offense. United States v. Leach, 429 F.2d 956 (8th Cir. 1970), cert. denied, 402 U.S. 986, 91 S.Ct. 1675, 29 L.Ed.2d 151 (1971); United States v. Goodwin, 440 F.2d 1152 (3rd Cir. 1971); United States v. Marcello, 423 F.2d 993 (5th Cir.), cert. denied, 398 U.S. 959, 90 S.Ct. 2172, 26 L.Ed.2d 543 (1970); United States v. Kartman, 417 F.2d 893 (9th Cir. 1969); United States v. Wallace, 368 F.2d 537 (4th Cir. 1966), cert. denied, 386 U.S. 976, 87 S.Ct. 1169, 18 L.Ed.2d 136 (1967); United States v. Lombardozzi, 335 F.2d 414 (2nd Cir.), cert. denied, 379 U.S. 914, 85 S.Ct. 261, 13 L.Ed.2d 185 (1964).

4. In Abbate v. United States, 359 U.S. 187, 194, 79 S.Ct. 666, 670, 3 L.Ed.2d 729 (1959), the Supreme Court specifically declined to overturn the rule announced in United States v. Lanza, 260 U.S. 377, 43 S.Ct. 141, 67 L.Ed. 314 (1922), that " *    *    * an act denounced as a crime by both national and state sovereignties is an offense against the peace and dignity of both and may be punished by each. *    *    * "

5. "FOR RELEASE TO A.M. NEWSPAPERS MONDAY, APRIL 6, 1959
"Ninety four United States Attorneys from as many districts in the states and territories, will convene here Monday for a two-day conference with officials of the Department of Justice. They will discuss problems of Federal law enforcement, with especial reference to the drive on organized crime and racketeering, and intra-departmental administrative matters.
"The group will be welcomed Monday morning by Attorney General William P. Rogers and one of the first matters to be presented to them will be the following statement:
"MEMORANDUM TO THE UNITED STATES ATTORNEYS
"In two decisions on March 30, 1959, the Supreme Court of the United States reaffirmed the existence of a power to prosecute a defendant under both federal and state law for the same act or acts. That power, which the Court held

■ This is not the first time this argument has been raised before this Court, and we admit that it troubles us. The policy established by the memorandum is wise and ought to be followed. But here, as in United States v. Synnes, *supra* at 773, n. 11, we do not find adequate support in the record to justify setting aside Kogan's conviction. Mechanic did not raise the issue below. See, K. Davis, Discretionary Justice (1969) at 162–187; Comment, The Right to Nondiscriminatory Enforcement of State Penal Laws, 61 Colum.Law Rev. 1103 (1961).

## JENCKS ACT

The defendants contend that the trial court should have struck the testimony of certain government witnesses because their trial testimony varied from statements they gave to FBI agents, and because the agents' original notes of the interviews were not produced.

■ The fact that variances exist between a witness's trial testimony and a pretrial statement does not mean that the testimony of the witness should be stricken. On the contrary, the purpose of the Jencks Act is to permit cross-examination and impeachment of the witness by pointing out such variances. See, United States v. Missler, 414 F.2d 1293 (4th Cir. 1969).

Several of the government's witnesses were interviewed, shortly after the civil disorder, by FBI agents who made notes at the time of the interviews. These

is inherent in our federal system, has been used sparingly by the Department of Justice in the past. The purpose of this memorandum is to insure that in the future we continue that policy. After a state prosecution there should be no federal trial for the same act or acts unless the reasons are compelling. "In Abbate v. United States and Bartkus v. Illinois [359 U.S. 121, 79 S.Ct. 676, 3 L.Ed.2d 684] the Supreme Court held that there is no violation of the double jeopardy prohibition or of the due process clause of our federal Constitution where there are prosecutions of the defendant, both in the state and in the federal court, based upon the same act or acts.

"This ruling reaffirmed the holding in United States v. Lanza, 260 U.S. 377 [43 S.Ct. 141, 67 L.Ed. 314] decided by the Supreme Court in 1922. * * * * * * * *

"But the mere existence of a power, of course, does not mean that it should necessarily be exercised. * * * * * * * *

"The Court held then that precedent, experience and reason supported the conclusion of separate federal and state offenses.

"It is our duty to observe not only the rulings of the Court but the spirit of the rulings as well. In effect, the Court said that although the rule of the *Lanza* case is sound law, enforcement officers should use care in applying it. "Applied indiscriminately and with bad judgment it, like most rules of law, could cause considerable hardship. Applied wisely it is a rule that is in the public interest. Consequently—as the Court clearly indicated—those of us charged with law enforcement responsibilities have a particular duty to act wisely and with self-restraint in this area.

"Cooperation between federal and state prosecutive officers is essential if the gears of the federal and state systems are to mesh properly. We should continue to make every effort to cooperate with state and local authorities to the end that the trial occur in the jurisdiction, whether it be state or federal, where the public interest is best served. If this be determined accurately, and is followed by efficient and intelligent cooperation of state and federal law enforcement authorities, then consideration of a second prosecution very seldom should arise.

"In such event I doubt that it is wise or practical to attempt to formulate detailed rules to deal with the complex situation which might develop, particularly because a series of related acts are often involved. However, no federal case should be tried when there has already been a state prosecution for substantially the same act or acts without the United States Attorney first submitting a recommendation to the appropriate Assistant Attorney General in the Department. No such recommendation should be approved by the Assistant Attorney General in charge of the Division without having it first brought to my attention.

"/s/ William P. Rogers
Attorney General"

notes had been destroyed by the time of trial. The defendants argue that these notes should have been produced and, failing that, that the witnesses' testimony should have been stricken.

 The ruling of a District Court on the producibility of statements under the Jencks Act will be disturbed only if it is clearly erroneous. Hayes v. United States, 329 F.2d 209 (8th Cir.), cert. denied sub nom. Bennett v. United States, 377 U.S. 980, 84 S.Ct. 1883, 12 L.Ed.2d 748 (1964); Matthews v. United States, 407 F.2d 1371 (5th Cir. 1969), cert. denied, 398 U.S. 968, 90 S.Ct. 2177, 26 L.Ed.2d 554 (1970). Here, it appears the notes were destroyed in good faith in the course of normal procedure and only after they had been substantially incorporated into the typed summaries which were produced. Thus, the trial court's ruling was not clearly erroneous. United States v. Lepiscopo, 429 F.2d 258 (5th Cir.), cert. denied, 400 U.S. 948, 91 S.Ct. 255, 27 L.Ed.2d 254 (1970); United States v. Covello, 410 F.2d 536 (2nd Cir. 1968), cert. denied, 396 U.S. 879, 90 S.Ct. 150, 24 L.Ed.2d 136 (1969); United States v. Hensley, 374 F.2d 341 (5th Cir.), cert. denied, 388 U.S. 923, 87 S.Ct. 2139, 18 L.Ed.2d 1373 (1967).

## SUFFICIENCY OF THE EVIDENCE

The defendants contend that, as a matter of law, the evidence was insufficient to sustain guilty verdicts. Their contention is valid only if the testimony of the chief prosecution witness, Donald Bird, is without credence.

There is evidence in the record that would indicate that Bird was a highly partisan witness who desired to see the defendants convicted. But the jury had an opportunity to observe him on the stand and thus could evaluate him more accurately than we can from a written record. If the jury believed Bird and disbelieved the defendants' witnesses, we cannot say as a matter of law that the evidence was insufficient to convict the defendants. United States of America v. Darris White, 451 F.2d 351 (8th Cir. 1971); United States v. May, 419 F.2d 553 (8th Cir. 1969).

The judgments of conviction are affirmed.