**UNITED STATES of America,
Plaintiff,**

**v.**

**Dennis BANKS et al., Defendants.**

**No. CR73–5034, etc.**

United States District Court,
D. South Dakota, W. D.

Dec. 17, 1973.

William F. Clayton, Sioux Falls, S. D., R. D. Hurd, Sioux Falls, S. D., David R. Gienapp, Sioux Falls, S. D., Ronald W. Banks, Rapid City, S. D. and Carleton R. Hoy, Sioux Falls, S. D., appeared in behalf of the plaintiff.

Mark L. Amsterdam, William M. Kunstler, Mark Lane, New York City, Kenneth E. Tilsen, St. Paul, Minn., Joseph Beeler, Chicago, Ill. and Douglas Hall, Minneapolis, Minn., appeared in behalf of the defendants.

## MEMORANDUM DECISION

NICHOL, Chief Judge.

These cases involve the occupation-siege of the town of Wounded Knee, South Dakota, which took place over a seventy-one day period in the early spring of 1973. The Federal Government brought two indictments against Russell Means and Dennis Banks, whose cases have been consolidated for trial. Having benefitted from the briefing expertise of counsel for both sides, having

held an evidentiary hearing, and having heard oral argument, this Court makes the following rulings on defendants' Motion to Dismiss the indictments:

#### Point I

Defendants' motion to dismiss on the grounds that 18 U.S.C. Sec. 231(a)(3)[1] is unconstitutional on its face and as applied in Counts IV and V is denied.

18 U.S.C. Sec. 231(a)(3) has been upheld as being neither unconstitutionally vague nor overly broad. See United States v. Mechanic, 454 F.2d 849, 853 (8th Cir. 1971), National Mobilization Committee to End War in Vietnam v. Foran, 297 F.Supp. 1, 3–5 (N.D.Ill. 1968), aff'd in 411 F.2d 934 (7th Cir. 1969). These cases have interpreted Section 231(a)(3) to require "specific intent", which has been alleged in both Counts IV and V, as one of the elements the government must prove. See also United States v. Featherston, 461 F.2d 1119 (5th Cir. 1972), cert. den. 409 U.S. 991, 93 S.Ct. 339, 34 L.Ed.2d 258 (1972), holding that Section 231(a)(3) is not unconstitutional on its face because the statute requires intent and does not cover mere inadvertent conduct. 461 F.2d 1122.

I disagree with defendants' contention that Section 231(a)(3) constitutes an abridgment of First Amendment activities. Mechanic, supra, 454 F.2d at 852, specifically states that "Section 231(a)(3) has no application to speech, but applies only to violent physical acts." Therefore,

> . . . since the statute does not attempt to curtail speech, the defendants may not challenge it as vague or overly broad if their own conduct may be constitutionally prohibited, since " . . . one to whom application of

a statute is constitutional will not be heard to attack the statute on the ground that impliedly it might also be taken as applying to other persons or other situations in which its application might be unconstitutional . . . ." United States v. Raines, 362 U.S. 17, 21, 80 S.Ct. 519, 4 L.Ed. 2d 524 and cases cited therein. United States v. Mechanic, supra, 454 F.2d at 853.

There is a difference between prohibiting free *expression*, which was the concern of the courts in Tinker v. Des Moines School District, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969), and Stamler v. Willis, 415 F.2d 1365 (7th Cir. 1969), and prohibiting certain *acts* to impede, obstruct or interfere with an official described in the statute, such as the throwing of cherry bombs in *Mechanic*, or the locating of trenches, bunkers and roadblocks manned by persons armed with guns as alleged in the present indictments. (Of course, our opinion here refers only to the sufficiency of the indictment and draws no conclusion as to the substantive merits of the same.)

We do not feel that by interpreting the statute in a constitutionally permissible light, the court in *Mechanic, supra,* rewrote 18 U.S.C. Sec. 231(a)(3). See Screws v. United States, 325 U.S. 91, 98, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945), and United States v. Harriss, 347 U.S. 612, 618, 74 S.Ct. 808, 98 L.Ed. 989 (1954). Even the decision in Aptheker v. Secretary of State, 378 U.S. 500, 84 S.Ct. 1659, 12 L.Ed.2d 992 (1964), cited extensively by defendants, does not state that a court may not construe legislation so as to save it against constitutional attack, but merely holds that the court may not carry this " . . . 'to the point of perverting the purpose of a

---

1. Section 231(a)(3) provides, in relevant part:
(3) Whoever commits or attempts to commit any act to obstruct, impede, or interfere with any fireman or law enforcement officer lawfully engaged in the lawful performance of his official duties incident to and during the

commission of a civil disorder which in any way or degree obstructs, delays, or adversely affects commerce or the movement of any article or commodity in commerce or the conduct or performance of any federally protected function . . . ..

statute . . . .' or judicially rewriting it." Scales v. United States as cited in *Aptheker,* supra, at 515, 84 S.Ct. at 1668. As previously pointed out, the Court of Appeals in *Mechanic* held that 18 U.S.C. Sec. 231(a)(3) does not purport to reach speech of any kind. It reaches only acts to impede, obstruct, or interfere with law enforcement officers or firemen. Such construction of the statute in no way "perverts its purpose."

### Point II

■ Point two of defendants' Motion to Dismiss alleges that the Major Crimes Act, 18 U.S.C. § 1153, under which the defendants were charged, is unconstitutional as violative of the Fifth Amendment. On the basis of the decision of the Court of Appeals for the Eighth Circuit in Kills Crow v. United States, 451 F.2d 323 (8th Cir. 1971), cert. denied 405 U.S. 999, 92 S.Ct. 1262, 31 L.Ed.2d 467 (1972), this portion of defendants' motion is denied.

### Point III

Defendants' motion to dismiss Count VI is granted on the grounds that the charge in said count does not fall within the scope of 18 U.S.C. Sec. 81.[2]

Count VI charges that the defendants " . . . did wilfully, knowingly, unlawfully and maliciously, set fire to and burn motor vehicles . . . ". For "motor vehicle" to be included within 18 U.S.C. Sec. 81, it would have to be classified as machinery. Such a classification would raise grave constitutional questions as to the vagueness of 18 U.S.C. Sec. 81. See e. g. Papachristou v. City of Jacksonville, 405 U.S. 156, 162, 92 S.Ct. 839, 31 L.Ed.2d 110 (1972), holding vagrancy ordinance void for vagueness; Coates v. City of Cincinnati, 402 U.S. 611, 615, 91 S.Ct. 1686, 29 L.Ed.2d 214 (1971), holding local assembly

ordinance in violation of due process standard of vagueness; United States v. Harriss, 347 U.S. 612, 617, 74 S.Ct. 808, 98 L.Ed. 989 (1954), upholding Federal Regulation of Lobbying Act but stating the requirement of definiteness in a criminal statute to be that a person of ordinary intelligence must be given fair notice that his contemplated conduct is forbidden by the statute; and Connally v. General Construction Co., 269 U.S. 385, 391, 46 S.Ct. 126, 70 L.Ed. 322 (1926), holding an Oklahoma wage law void for uncertainty.

■ The term "machinery" as used within 18 U.S.C. Sec. 81 cannot be taken so out of the context of its surrounding words to include "motor vehicle." To do so would ignore the longstanding principle of statutory construction of *ejusdem generis* (see United States v. Freeman, 473 F.2d 7 (8th Cir. 1973)), and endanger the constitutionality of the Act on its face. We therefore dismiss Count VI of the indictment.

### Point IV

Defendants' motion to dismiss several counts of the indictment on the grounds that they do not charge anything which constitutes an offense is denied except as to Count VI. (See discussion on Count VI in Point III of this memorandum of law).

■ Counts IV & V—By alleging that defendants prepared and located trenches, bunkers and roadblocks which were manned by persons armed with guns, Counts IV and V are sufficient to charge an offense. 18 U.S.C. Sec. 231(a)(3) makes no requirement of direct physical contact with the federal officers, but rather applies to anyone who commits or even attempts to commit *any* act to obstruct, impede or interfere with any fireman or law enforcement official. Actual interference is not required; in-

---

**2.** Whoever, within the special maritime and territorial jurisdiction of the United States, willfully and maliciously sets fire to or burns, or attempts to set fire to or burn any building, structure or vessel, any machinery or building materials or supplies, military or naval stores, munitions of war, or any structural aids or appliances for navigation or shipping, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

tent to interfere is. (See discussion in Point I.)

■ Count VII—In their well-written and persuasive brief, defendants make a good case for the proposition that Molotov Cocktails were not intended to be included under 26 U.S.C. Sec. 5861 of the National Firearms Act, and that Count VII therefore fails to charge a criminal offense. As well as giving a detailed analysis of Congressional intent behind the statute, defendants present three salient issues on this point.

1. In court argument, defendants cited the fact that a 1970 statute, 18 U.S.C. Sec. 844, The Explosive Control Act, makes it a federal offense to possess or use Molotov Cocktails. It is a logical conclusion that the 1968 firearms act does not extend to Molotov Cocktails, or there would have been no need for their specific inclusion in the later Act.

2. Defendants in their brief argue that for an item to come within The National Firearms Act, it must be inherently within the Act on the basis of its objective characteristics and that the intent of the user is irrelevant. See United States v. Schofer, 310 F.Supp. 1292, 1297 (E.D.N.Y., 1970), United States v. Posnjak, 457 F.2d 1110, 1116 (2d Cir. 1970). (But see also United States v. Oba, 448 F.2d 892 (9th Cir. 1971), which allowed intent to bring an item into the coverage of the Act.)

Defendants contend that a Molotov Cocktail cannot come within the Act since only by looking to a user's intent can such an item become a "destructive device." They claim that there are legitimate uses for glass containers filled with flammable liquid and stopped up with cloth in the neck either as storage containers or lanterns; and thus, the fully completed Molotov Cocktail, as well as its components, would not objectively be within the Act. Defendants cite the D.C. Court Reform Act (P.L. 91–358, U.S.Code Congressional and Administrative News 91st Congress, 2d Sess., 1970, p. 707) which provides the following exemption:

MOLOTOV COCKTAILS AND OTHER EXPLOSIVE DEVICES

Sec. 15A(a) No person shall within the District of Columbia manufacture, transfer, use, possess, or transport a molotov cocktail. As used in this subsection, the term 'molotov cocktail' means (1) a breakable container containing flammable liquid and having a wick or a similar device capable of being ignited, or (2) any other device designed to explode or produce uncontained combustion upon impact; but *such term does not include a device lawfully and commercially manufactured primarily for the purpose of illumination, construction work, or other lawful purpose.* (emphasis added.)

Although defendants' contention does have merit, the court is reluctantly compelled by existing case law to hold against the defendants in this matter.

3. Defendants further argue that if 26 U.S.C. Sec. 5861 is applied to include Molotov Cocktails, and since such a device would necessarily have to involve the user's intent to *become* a Molotov Cocktail, there would be a forced registration of criminal intent, thus presenting "acute problems of self-incrimination." United States v. Posnjak, *supra,* 457 F.2d at 1118.

The defendants differentiate the present case from Varitimos v. United States, 404 F.2d 1030, 1034 (1st Cir. 1968), cert. den. 395 U.S. 976, 89 S.Ct. 2126, 23 L.Ed.2d 765 (1969), and Desimone v. United States, 423 F.2d 576, 581–582 (2d Cir. 1970), which held that the Fifth Amendment privilege does not apply to prospective acts if they are merely speculative. In the case of a Molotov Cocktail, defendants contend, the act of throwing such a device is not merely speculative, it is an immediately necessary follow-up to the intent needed to produce a Molotov Cocktail in the first place. As defendants state in their brief, "The act of throwing the Molotov Cocktail is the next logical step after one has formed the intent to throw the item (and has therefore brought the

item into the Act as a destructive device). It is not similar to registering a bazooka and then using it to hold up a bank." Defendants' brief, footnote, p. 58. (For the view that the registration requirements do not violate the privilege against self-incrimination, see United States v. Davis, 313 F.Supp. 710 (D. Conn.1970), a case which involved a defendant arrested in possession of empty bottles, cloth strips, and a two gallon can of gasoline.)

Despite the well-reasoned and compelling arguments presented above, we feel constrained to rule against the defendants on their motion to dismiss Count VII. We do so because our research has disclosed the glaring fact that existing case law unanimously accepts the inclusion of Molotov Cocktails under 26 U.S.C. Sec. 5861, and defendants can point to no exceptions. See United States v. Ross, 458 F.2d 1144 (5th Cir. 1972), cert. den. 409 U.S. 868, 93 S.Ct. 167, 34 L.Ed.2d 118 (1972); United States v. Cruz, 455 F.2d 184 (2d Cir. 1972), cert. den. 406 U.S. 918, 92 S.Ct. 1769, 32 L. Ed.2d 117 (1972); United States v. Yaple, 450 F.2d 308 (9th Cir. 1971). See also United States v. Davis, *supra*, 313 F.Supp. at 713, 714, which went so far as to hold that a defendant in possession of the *component parts* of a Molotov Cocktail was in possession of a "destructive device" within the meaning of the National Firearms Act.

The discussion of the court in *Ross, supra*, had the strongest influence on our decision, and although the Second Circuit Court of Appeals appeared to severely limit the term "destructive device" in *Posnjak, supra*, they did not upset a ruling by the same court, made only a month previous, which allowed a conviction under 26 U.S.C. Sec. 5861 for possession of a Molotov Cocktail. United States v. Cruz, *supra*, 455 F.2d at 186. Thus, while we may have some misgivings about these legal interpretations of the Firearms Act, on the basis

of such court decisions we refuse to dismiss Count VII of the indictment.

Count IX—Count IX of the indictment is a plain, concise and definite statement of the essential facts constituting the offense of conspiracy in full compliance with rule 7(c), and validly charges a criminal offense.

### Point V

■ Defendants' motion to dismiss on the grounds that 26 U.S.C. Sec. 5861 is unconstitutional on its face and as applied in Count VII of the indictment is denied.

While we express the same misgivings elaborated upon in Point IV, we hold that 26 U.S.C. Sec. 5861 is not unconstitutionally vague nor in violation of the privilege against self-incrimination. United States v. Freed, 401 U.S. 601, 91 S.Ct. 1112, 28 L.Ed.2d 356 (1971), reh. den. 403 U.S. 912, 91 S.Ct. 2201, 29 L. Ed.2d 690 (1971). Neither does 26 U. S.C. Sec. 5861 impinge upon the right of a state to invite the Federal Government to assist it in violation of Art. IV of the Constitution. See p. 37 of the government's brief.

### Point VI

Point six of defendants' Motion to Dismiss alleges that Counts 1, 2, 3, 4, 5, 6, 8, and 9 of Indictment No. 5035 and Counts 1 and 2 of No. 5063 fail to apprise the defendants of the nature of the offense charged in violation of the Fifth and Sixth Amendments. This portion of defendants' motion is hereby denied.

■ Rule 7(c) of the Federal Rules of Criminal Procedure provides, in relevant part, that: "The indictment or information shall be plain, concise and definite written statement of the essential facts constituting the offense charged." Every count of both indictments meets this standard. Every count apprises the defendants of what they

must meet and protects them against the dangers of double jeopardy. If more information is required, the proper course is to move for a bill of particulars as the defendants have already done.

### Point VII

Point seven of defendants' Motion urges dismissal of the indictments on the ground that the daily government press releases during the occupation have prevented the defendants from receiving a fair trial. This portion of defendants' motion is hereby denied.

 Assuming the propriety of dismissing an indictment prior to trial due to the effects of pre-trial publicity, and assuming (although I think the assumption unwarranted) that the press releases had the prejudicial effect which defendants contend they had, I think there are two factors which have minimized that effect and have made it possible for the defendants to obtain a fair trial. First, eight months will have elapsed between the alleged adverse publicity and the trial date, substantially reducing the chances that the publicity will have an effect on a prospective panel. Second, the venue has been changed to St. Paul, Minnesota, the location requested by the defendants themselves. These two factors, coupled with the protections built into the jury selection process, convince me that these defendants can get a fair trial.

### Point VIII

Point eight of defendants' motion urges dismissal of the indictments on the ground that they are brought in bad faith thereby violating the rights of the defendants under the Fifth and Ninth Amendments to the Constitution. This portion of defendants' motion is hereby denied.

 It is clear that discriminatory enforcement of the law, by either state or federal officials, constitutes a denial of equal protection. Yick Wo v. Hopkins, 118 U.S. 356, 6 S.Ct. 1064, 30 L. Ed. 220 (1886); Washington v. United States, 130 U.S.App.D.C. 374, 401 F.2d 915 (1968). The primary way in which discriminatory law enforcement can be exhibited is by the use of the prosecutorial prerogative itself to discriminate against those whose constitutionally protected views or activities are not popular with the government (selective prosecution). The defendants contend that it can be exhibited in another way—by the use of law enforcement procedures other than prosecution to harass those whose views are unpopular.

 Perhaps the leading case dealing with selective prosecution and setting forth the mechanics by which a defendant can establish that defense is United States v. Falk, 479 F.2d 616 (7th Cir. 1973). The case involved a prosecution for failure to possess a selective service registration card and failing to possess a draft identification card. The defendant had been a member of a draft counselling service. The defendant contended that he was selectively prosecuted because of his leadership role in opposing the draft rather than because he was in violation of the statute. In reversing and remanding, the Court of Appeals attempted to delineate that narrow line between the presumptive regularity of prosecutorial decisions and impermissible prosecutorial selectivity. The Court held that, where the defendant presents facts sufficient to raise a reasonable doubt about the prosecutor's purpose, the burden of going forward with the evidence shifts to the prosecutor to prove with compelling evidence that the decision to prosecute was arrived at in good faith.

 The Court in *Falk* concluded that the defendant had raised that reasonable doubt. Comparing *Falk* to the instant case, it is clear that the defendants in the instant case do not approach the level of inference attained in *Falk*. The crime charged in *Falk* was a purely regulatory crime which was seldom if

ever prosecuted. Indeed, there was a stated Justice Department-Selective Service policy not to prosecute those who had relinquished possession of their draft cards. In the instant case, the defendants are charged with serious and dangerous crimes. This fact enhances the presumption of prosecutorial regularity since it renders much *less* likely the possibility that the government was motivated by a desire to discriminate against specific individuals for their engagement in constitutionally protected activities, and much *more* likely that the government was properly motivated by a desire to protect society from dangerous and illegal activities. In *Falk*, an Assistant United States Attorney testified that officials from the Department of Justice in Washington had participated in the decision to prosecute Falk. This admission went a long way to raise the specter of political interference with prosecutorial decision-making. In the instant case, the United States Attorney for the District of South Dakota, William Clayton, in testimony which was corroborated by Richard Kleindienst, Attorney General of the United States at the time of the Wounded Knee incident, stated that it was he and he alone who made the decision about whom to prosecute and whom not to prosecute and that he made that decision on the basis of the evidence.

 Evidence of selectivity presented by the defendants does not raise that reasonable doubt. Defendants presented testimony about an incident which occurred at a tribal roadblock, which the federal government permitted to remain on one of the roads leading into Wounded Knee. There was extant at the time a federal court order permitting foodstuffs and medical supplies to be taken into the occupied area. United States Marshal George Tennyson agreed to accompany a car carrying such supplies up to and past the Tribal roadblock. When the Marshal and the car arrived at the roadblock, those who manned it, with knowledge of the court order, denied the automobile access to the route into the occupied area. They emptied the automobile of its supplies and forced the car to turn around and go back. The Marshal did not make an attempt to enforce the court order at the roadblock site. Given the animosity of the Tribal police toward the American Indian Movement and its sympathizers and given the fact that every individual manning that roadblock was armed, it is not difficult to understand the Marshal's reluctance. Not only were the Marshal and his fellow law enforcement officers entrusted with the task of liberating the occupied town of Wounded Knee, but they were also responsible for doing everything possible to avoid bloodletting between the A.I.M. people and the Tribal Indians and residents of Wounded Knee. Far be it from this Court to add to those burdens by telling the United States Marshal what he should have done under those pressurized circumstances. Perhaps now, after the event, fairness would be served by the bringing of criminal actions against those manning the roadblocks. The mere fact, however, that indictments have not been sought prior to this time does not raise that reasonable doubt about the motives of the United States Attorney.

Perhaps the leading case dealing with bad faith harassment tactics by law enforcement officers is Medrano v. Allee, 347 F.Supp. 605 (S.D.Tex.1972), argument on which was recently heard by the Supreme Court. 42 U.S.Law Week 3297 (Nov. 20, 1973). The defendants were seeking injunctive and declaratory relief against state and local officials in Southern Texas who were harassing union members in an attempt to prevent them from organizing migrant farm workers. The three-judge District Court held that the officials were undertaking the enforcement of the law in bad faith—that the officials were utilizing their positions as law enforcement officers to destroy the farm workers union. Among their activities which compelled the Court to draw this conclusion

were: (1) numerous instances of detention without arrest; (2) numerous instances of the abuse of bonding procedures; (3) numerous instances of physical abuse; (4) instances of violent and brutal arrests; (5) many indications that the state officials were sent specifically to end the strike, and not to enforce the law; (6) distribution of anti-union newspapers by Sheriff's office.

Assuming without deciding that a factual situation comparable to that in *Medrano* would support the dismissal of criminal indictments, I think a comparison between *Medrano* and the instant case demonstrates that dismissal is not called for. I do not think that the takeover at Wounded Knee can be compared to the efforts of the organizers to unionize the farm workers. Neither do I think that the isolated instances of harassment which this record reveals can be compared to the unified and concentrated effort of the Texas law enforcement officials to break the farm workers' strike. Amidst the intense pressure consequent to a seventy-one day armed confrontation, where law enforcement officials were taxed with the double burden of freeing Wounded Knee from its occupiers *and* preventing confrontation between the occupiers and the occupied, it would seem inevitable that incidents would take place which could be pointed to as constituting police harassment. It is not reasonable to suggest, however, that these incidents constitute part of a governmental scheme to deny the defendants their right to speak their mind and better their condition.

It is the conclusion of this Court that, while there may have been harassment by government and tribal officials of the A.I.M. affiliated people, that harassment did not originate in governmental policy, nor was it a part of a governmental effort to stifle any constitutionally protected activities of the defendants. The decision to prosecute these defendants was undertaken by the United States Attorney's office in good faith for the purpose of attempting to bring to justice those who violate the law.