**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Anthony F. GOMEZ, Defendant-Appellant.**

No. 85–2726.

United States Court of Appeals, Tenth Circuit.

Dec. 31, 1986.

Robert N. Miller, U.S. Atty., and Patrick T. Murphy, Asst. U.S. Atty., Denver, Colo., for plaintiff-appellee, U.S.

Michael F. Scott, Daniel P. Barrera, and Charles S. Vigil, Denver, Colo., for defendant-appellant, Anthony F. Gomez.

---

**12.** *Accord Houghton v. South,* 743 F.2d 1438 (9th Cir.1984) (per curiam).

Before McKAY and BALDOCK, Circuit Judges, and BROWN, Senior District Judge.*

WESLEY E. BROWN, Senior District Judge.

In this case the appellant Anthony F. Gomez was found guilty by jury upon an indictment which charged him with soliciting a sum of money for himself in return for being influenced in the performance of his official duties as a government employee at the Fitzsimmons Medical Center in Denver, Colorado, in violation of 18 U.S.C. Section 201(c).

Section 201(c) provides in pertinent part that:

"Whoever, being a public official or person selected to be a public official, directly or indirectly, corruptly asks, demands, exacts, solicits, seeks, accepts, receives, or agrees to receive anything of value for himself or for any other person or entity, in return for:

(1) being influenced in his performance of an official act; ...."

commits an offense against the laws of the United States. A "public official" includes persons who are employees or acting for or on behalf of the United States. The term "official act", means "any decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending ... before any public official, in his official capacity, or in his place of trust or profit." 18 U.S.C. Section 201(a).

In this appeal, Gomez contends that the evidence was insufficient to sustain a conviction, and that he was deprived of a fair trial because the prosecution suppressed evidence contained in the employment file of Charles Jones, the government's chief witness.

Viewed in the light most favorable to the government, the evidence in this case established the prosecution's case in the following manner:

The defendant Gomez had been an employee of the United States Government for over eighteen years, employed in various positions. For the past five years, and at the time in question, he was employed as a maintenance mechanic at the Fitzsimmons Medical Center in Aurora, Colorado, with responsibility for three large buildings, including a grocery store, warehouse and office building. He repaired equipment and controlled supplies. He also worked as supply coordinator, purchasing items for the store, getting prices from vendors and passing them on to his supervisors who thereafter prepared purchase requests, etc. In particular, defendant was the supply representative for the Fitzsimmons Commissary.

In 1984, the government purchased equipment for a closed circuit television security system for each United States Army Commissary within the Army's Midwest Region, including the Commissary at Fitzsimmons Army Medical Center. In order to obtain funds for installation of the equipment, cost estimates were solicited from the commercial sector. Under established government procedures, funding authorization would then be obtained, work and purchase requests would be prepared, and then formal bids would be solicited from those companies which had furnished cost estimates.

In late 1984 and early 1985, defendant Gomez, as the assistant to the Fitzsimmons Deputy Commissary Officer, began contacting potential bidders for installation of the equipment at the request of his superior, Forest D. McDowell, the Army Security Safety Specialist for the Midwest Commissary Region. One of the first bidders contacted was the firm, Peke Systems, which gave an estimate of approximately $32,000 for the work. McDowell advised defendant Gomez that this was too high a price, since estimates for similar work at other commissaries throughout the Midwest Region had

* Honorable Wesley E. Brown, United States Senior District Judge for the District of Kansas, sitting by designation.

been between $8,000 and $10,000. McDowell advised Gomez of some inaccuracies in the description of the required work and new estimates were requested.

In late January, 1985, Gomez contacted Chuck Jones, Sales Manager of Photo-Scan, and requested an estimate on the Fitzsimmons installation. Jones, Clifford Cooper, Vice President of Photo-Scan's Technical Operations, and the defendant Gomez, walked over the job site, and Cooper then prepared a bid estimate of $4,300.00 to $4,500 for the installation, plus $788.00 for extra electrical subcontracting.

On February 4, 1985, Jones called Gomez, advising him of these figures and offering to confirm the estimate in writing at Gomez' office. Gomez replied that he would prefer to meet elsewhere, and Jones and Gomez met later that day at the Village Inn at approximately 11:30 a.m.

Jones testified that defendant Gomez told him that considerable money could be made—that Jones' bid was low and could be raised so long as it was just under $8,000, and that he, Gomez, could guarantee that Photo-Scan would get the contract if there was something in it for him. Gomez also told Jones that there were other jobs at other commissaries, and that Photo-Scan would be in line for these, once the Fitzsimmons job was set.

Jones testified that he told the defendant that it was common commercial practice for a 10% finders fee to be paid, but Gomez told him that the government disapproved of that sort of thing. In describing how he wanted to receive the money, Jones testified that Gomez tapped under the table and told Jones that he had a friend who would cash a check for him, and that he would give Jones the name and address of the lady at a later time.

Jones testified that following this conversation, he took out one of his business cards—wrote out the figure $7,946.00—told Gomez that he could not pay a fee for the electrical contract—defendant stated he understood. Jones then subtracted $788.00 from $7,946.00, and 10% of the remaining figure, that is, $715.80 was written on the card. Gomez then told Jones this would be acceptable. The business card, carrying the above figures, was introduced in evidence at trial.

Jones testified that after his conversation, he returned to the office and told Jeffrey and Paul Marcus, the President and Chairman of the Board of Photo-Scan, that Gomez had solicited a bribe. On February 7th, the Marcuses, with Jones, reported this to the F.B.I. and arrangements were made so that future contacts between Jones and Gomez could be taped and recorded.

On February 8, 1985 Jones and Gomez met in the parking lot of the Village Inn where Jones showed Gomez the Photo-Scan estimate of $7,946.00 for the installation. Gomez told Jones that the proposal was fine, that there would be no trouble because they would not meet again, and Gomez told Jones that if anyone ever asked him how Photo-Scan obtained the contract, the story should be that a woman had called in the information and asked for a finder's fee. Jones offered to pay Gomez at this meeting, but Gomez said he wanted to wait until everything was finished and that he would give Jones the woman's name to be put on the check. On this occasion, Jones was wearing a microphone, the conversation was recorded and introduced into evidence, and a transcript of that conversation was available as Government Exhibit 7A.

The evidence established that Gomez contacted McDowell and gave him estimates from Photo-Scan and a new estimate from Peke Systems. He recommended that Photo-Scan be selected. McDowell obtained spending authorization for installation in the exact amount of the Photo-Scan bid, and solicitation of formal bids began from the sources suggested by Gomez. While the bid process was pending, Jones and Gomez talked by telephone on several occasions and all of these calls were recorded and transcripts were introduced into evidence for the jury's consideration.

On July 19, 1985, the last day for receiving bids, Gomez learned that the contracting office had received a bid only from Peke Systems. Gomez called Jones and arranged to meet him and take him to the contracting office so that the Photo-Scan bid could be delivered before 4:30 that day. After the bid was delivered, Jones testified that Gomez told him to pay his fee after the contract was awarded, and that the name to be put on the check was "Patricia Bunney."

On July 22, 1985 the installation contract was formally awarded to Photo-Scan and Gomez and Jones met that day in the parking lot of the Village Inn. Although Jones was carrying a microphone during the meeting, there was a malfunction, and no tape of the conversation was available at trial, although two F.B.I. agents were able to monitor the conversation from a nearby vehicle. At this meeting, Jones handed over a check made out to Patricia E. Bunney in the amount of $715.80. Gomez took the check, looked at it, and said "beautiful." When Gomez got out of Jones' car, several F.B.I. agents approached and arrested him. Gomez told Jones that "It looks like we've been busted," and threw the check to the ground, where it was discovered under the tire of defendant's car.

Patricia Bunney testified for the government. She stated that she had been going out with Gomèz for five years or so, but that she knew nothing about the check or Gomez receiving money from Photo-Scan.

In defense, Gomez testified that he was only a maintenance mechanic at the commissary and that he only became involved with Jones in order to conduct his own investigation into a bribery scheme at Fitzsimmons. He also introduced character evidence. In addition, at trial, and in this appeal, Gomez contends that Jones was incompetent as a witness and unworthy of belief because of his past history of mental problems. Defendant also claims that he was denied a fair trial because the government suppressed the contents of Jones' employment file at Photo-Scan which revealed that Jones had resigned his job there, and had some medical problems.

At the beginning of Jones' testimony for the government, he described an unfortunate personal history dating back to his military discharge in 1964 because of a "long standing character and behavior disorder" which damaged his effectiveness as a soldier. In Michigan in 1974, he robbed two banks and three convenience stores, all within a month. At that time, he had just been divorced, lost custody of his son, and was deeply depressed. Two years before that he had tried to commit suicide by hanging himself in his parents' basement. At that time he believed he was attempting to kill a Colonel Heydon, a person he had had difficulty with during his military service. At the time of his arrest for the robberies, he was hospitalized and received intensive psychiatric treatment at a Veterans Hospital in Battle Creek, Michigan, for approximately thirty days. He was then tried for armed robbery of one of the banks, and was found not guilty by reason of insanity. He was directed to report to a Forensic Psychiatric Center in Ypsilanti, Michigan, where he was evaluated and released within one day. He continued to receive out-patient treatment for six or seven months, four times a month, at another Veteran's Hospital in Dearborn, Michigan.

Jones testified that he had had no mental problem or depression since 1975. He remarried, had two children, moved to Colorado, and began his own business as a manufacturer's representative. Photo-Scan was one of his customers, the Marcuses had known him for about ten years, and they had asked him to come and work for them as sales manager where he had been employed for over two years. Jones testified that the Marcuses were not aware of his past history until he disclosed all of the facts to them shortly before trial.

Jones' personnel file contained a letter of resignation, tendered after the arrest of Gomez, and a notation that he had been given prescriptions for antibiotics. Prior to trial defense counsel advised the court that he wished to cross-examine Jones in regard

to the prescriptions upon the theory that since Jones took antibiotics, he suffered from a venereal disease and therefore was under stress and incompetent to testify. The trial court ruled that it was not reasonable to infer that because a witness was taking antibiotics, he had venereal disease, and that in any event, venereal disease or the sexual proclivities of a witness had no relevance to the case. In accordance with the court's ruling on the resignation letter, Jones was cross-examined at length, and it was established that the letter was the result of differences in management policies, which the Marcuses and Jones had resolved. There was no evidence that this letter had any relevance to the Gomez investigation.

 The district judge had broad discretion in determining the competency of a witness to testify, and his decision will not be reversed in the absence of an abuse of discretion. *United States v. Spoonhunter,* 476 F.2d 1050 (10 Cir.1973); *Bickford v. John E. Mitchell Co.,* 595 F.2d 540 (10 Cir.1979). In order to exclude a witness because of incompetency that incompetency must clearly appear from the evidence to establish doubt as to the witness' credibility. Here, the testimony of the witness Jones was clear and concise. His problems in the past were frankly discussed, without hesitation, and he was subjected to an extensive and severe cross examination. His testimony concerning Gomez was corroborated by the tapes of the conversations, the testimony of the F.B.I. agents who monitored the meetings between Gomez and Jones, and by the calculations upon Jones' business card, and the check made out to Patricia Bunney.

 Defendant's claim that the witness Jones was a government agent who induced or entrapped him into committing a crime is without merit. In the first instance, the evidence established that the crime was committed on February 4 when Gomez solicited a bribe from Jones—prior to the time that Jones had any contact whatsoever with the F.B.I. Entrapment can only occur when a criminal design originates with agents of the government who place a disposition to commit a crime into the mind of an innocent person. See *United States v. Gurule,* 522 F.2d 20, 23, *cert. den.,* 425 U.S. 976, 96 S.Ct. 2177, 48 L.Ed.2d 800 (10 Cir.1975). The evidence of Gomez' acts and statements after the meeting of February 4th corroborated the testimony of the witness Jones and clearly established Gomez' predisposition to criminal conduct. Furthermore, a defendant is only entitled to present an entrapment defense when he admits to criminal conduct—an admission which Gomez has never made in this prosecution. *United States v. Mora,* 768 F.2d 1197, (10 Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 856, 88 L.Ed.2d 895.

 Gomez contends that he could not be convicted of soliciting money for himself since the check was made out to a third party, Patricia Bunney. The evidence established that the check was made out in accordance with defendant's own request and directions so that in the event of discovery, the money could not be linked to him.

 The credibility of the witness Charles Jones was for the jury to determine. His testimony, together with the other evidence described above, when considered in a light most favorable to the government, supports the jury's verdict. See *United States v. White,* 673 F.2d 299, 301–302 (10 Cir.1982).

 Gomez contends that his confrontation rights were violated because the medical and criminal history of the witness Jones was not available until two weeks before trial, and because the government improperly suppressed evidence from Jones' personnel records.

These claims are without merit. The record reflects that all information and records within the government's possession were promptly made available to defendant, and that other records from Michigan were promptly handed over to the defense when received by the government. Jones signed medical releases, and his medical

records from the Veteran's Administration and other treatment centers in Michigan were sent to the defense. We are satisfied that the defense had access to all materials pertaining to Jones' history, and that there was no denial of confrontation on this account. The determination of whether or not evidence of antibiotic prescriptions in Jones' personnel file would be admitted in the case was a matter within the trial court's discretion, and we find no abuse in the exercise of that discretion.

There being no error, defendant's conviction is AFFIRMED.