54 F.3d 777
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
 NATIONWIDE MUTUAL FIRE INSURANCE COMPANY, Plaintiff-Appellant,
v.
Wilda Jean CARTER, Defendant-Appellee.
 No. 93-5888.
 United States Court of Appeals, Sixth Circuit.
 May 19, 1995.
 
 Before: NELSON and DAUGHTREY, Circuit Judges, and CHURCHILL, District Judge.*
 PER CURIAM.
 
 
 1
 The plaintiff, Nationwide Mutual Fire Insurance Company, filed suit against its insured, defendant Wilda Jean Carter, seeking a declaratory judgment that Nationwide was not responsible for payment to Carter under a homeowner's insurance policy because Carter allegedly procured another individual to set fire to her dwelling. Carter counterclaimed, alleging breach of contract on the part of Nationwide, and demanded judgment for amounts due under the policy. Following a jury trial, judgment was entered in Carter's favor. On appeal, Nationwide contends that the district court erred in excluding the testimony of a witness and in denying Nationwide a directed verdict in its favor based upon insufficient proof of damages. For the reasons set out below, we conclude that the judgment of the district court must be reversed and the case remanded for a new trial.
 
 I.
 
 2
 Jean and Billy Carter had originally purchased property and a dwelling on Clearview Road in Cottontown, Tennessee, for $32,000. Over the years, the couple made extensive renovations and additions to the home, so that the residence eventually totalled approximately 3,500 square feet. Once the Carters began residing in the Clearview Road home, Jean Carter converted her existing insurance on the property to homeowner's coverage with Nationwide. Pursuant to the terms of the policy, Nationwide agreed to provide up to $120,000 in coverage for damage to Carter's dwelling, up to $12,000 in coverage for damage to other structures on the property, and up to $66,000 in coverage for damage to Carter's personal property.
 
 
 3
 While at work in Nashville sometime after 1:00 a.m. on May 11, 1990, Jean Carter was informed that her house was on fire. The White House (Tennessee) Volunteer Fire Department had earlier received an alarm reporting the fire and had responded to the conflagration. Unfortunately, as the parties later stipulated, "[t]he fire resulted in substantial damage to the dwelling and personal contents therein."
 
 
 4
 Initially, Nationwide provided Carter with $2,500 for temporary lodging and expenses, paid $500 to the local fire department, and paid $25,211.81 to the bank holding the mortgage on the property. Subsequently, however, Nationwide determined that the fire had been set intentionally by Carter, or by someone at her behest, and refused to provide additional payments under the policy.
 
 
 5
 On September 10, 1990, Pam Bush, the sister of Carter's son-in-law, contacted John Schwalb, an attorney representing Nationwide in the Nashville area. Bush gave Schwalb a transcribed "statement" that indicated that she lived near Jean Carter and had been informed by Carter shortly before the fire that she was seeking to employ someone to burn her home. Then, three or four days prior to the fire, Bush allegedly observed Carter and Carter's daughters from a previous marriage removing household items from the home and driving them away in a pickup truck and in a van. Bush further stated that on the day before the fire, Jean Carter told her she had found someone to burn her home for $2,000 and that "it was almost over now." According to Bush, Carter again confided in her after the fire and explained that the hired arsonist first attempted to ignite a blaze in the downstairs portion of the home. When that fire extinguished itself, the arsonist allegedly returned and reignited the blaze upstairs.
 
 
 6
 On January 8, 1991, Bush executed a "Sworn Statement" before a notary public recanting all allegations made in her September 10 statement to Schwalb. She offered as reasons for her earlier misstatements the fact that she herself had previously been denied insurance coverage because of falsehoods stated against her and the fact that she was feuding with her brother and with Carter. Bush then followed that "Sworn Statement" with a January 25, 1991, letter to Schwalb again admitting her false accusations and intimating that Schwalb had threatened or intimidated her into participating in an attack on innocent people.
 
 
 7
 On March 8, 1991, Bush appeared at a deposition noticed by Schwalb. At that time, she withdrew her January recantation and reaffirmed the allegations made in her first statement to Schwalb in September 1990, accusing Jean Carter of procuring an individual to burn her house in order to obtain insurance proceeds. During the deposition, Bush also insisted that her January recantation was prepared by her father, who threatened to kill her and her mother and to sever the penis of her three-year-old son if Bush did not sign the letter disavowing the September allegations. Bush further stated that she called Schwalb from a pay phone immediately after mailing him the letter of recantation and orally informed him that the contents of the letter were false and coerced.
 
 
 8
 Approximately one year later, on March 13, 1992, Bush hand-delivered another letter to Schwalb recanting the allegations made against Carter in both the September 1990 statement and the March 1991 deposition. In the letter, she also accused Schwalb of threatening her with a perjury charge if she did not disavow her earlier recantation and insisted that she was suffering from severe physical and mental problems at the time of the 1991 deposition.
 
 
 9
 Nationwide's lawsuit was tried by a jury in January 1993. Just prior to commencement of the trial, the district court conducted a hearing on Carter's motion in limine to exclude Pam Bush's deposition testimony, assuming her unavailability at the time of trial. Bush was called to the stand and invoked her Fifth Amendment privilege against self-incrimination in response to every question she was asked. The district court found that Bush was "inherently unreliable" and ruled that her deposition could not be introduced at trial, because she would not be available to explain adequately the inconsistencies in her story.
 
 
 10
 Nevertheless, the insurance company did present expert testimony indicating that the fire at the Carter home was intentionally set, probably in two different areas of the house -- one upstairs and the other on the ground floor. Carter countered with the testimony of an expert who claimed that examination of the burning pattern of the blaze established that the fire was not started with an accelerant but, instead, as a result of an electrical malfunction. In its verdict, the jury credited the defendant's theories and witnesses and absolved Carter of all wrongdoing. The jury also awarded Carter $108,588.19 in damages, as a result of Nationwide's failure to pay under the homeowner's insurance policy.
 
 II.
 
 11
 On appeal, Nationwide asserts that the district court abused its discretion in disallowing the deposition testimony of Pam Bush. Specifically, the company argues that the witness's unreliability presented a question of credibility for the jury and not a question of competence for the court.
 
 
 12
 When a district court does rule upon the competency of a witness to testify, the court has broad discretion in making that decision. United States v. Gomez, 807 F.2d 1523, 1527 (10th Cir. 1986). That decision will be reversed only upon a showing of an abuse of discretion. Id.
 
 
 13
 Under Rule 601 of the Federal Rules of Evidence:
 
 
 14
 Every person is competent to be a witness except as otherwise provided in these rules. However, in civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the competency of a witness shall be determined in accordance with State law.
 
 
 15
 Likewise, Tennessee law provides that "[e]very person is presumed competent to be a witness except as otherwise provided in these rules or by statute." Tenn. R. Evid. 601. As noted in the advisory commission comments to the Tennessee Rules of Evidence, Rule 601 now establishes a rebuttable presumption of the competency of all witnesses, in place of the prior requirement of establishing that a witness is "of sufficient capacity to understand the obligation of an oath or affirmation." Moreover, both this court and the Tenth Circuit have explicitly recognized that prior inconsistent statements made by a prospective witness on a particular subject do not disqualify that individual from testifying in court. United States v. Jenkins, 525 F.2d 819, 826 (6th Cir. 1975); United States v. Bedonie, 913 F.2d 782, 799-801 (10th Cir. 1990), cert. denied, 501 U.S. 1253 (1991).
 
 
 16
 In Bedonie, the Tenth Circuit rejected a contention that a witness could be "so untrustworthy as to lack the fundamental capacity of a witness." Id. at 800. Quoting from 2 Wigmore, Evidence Sec. 515, at 721-22 (Chadbourn rev. 1979), the court noted:
 
 
 17
 There are two objections to any attempt to establish such an incapacity. The first is that in rational experience no class of persons can safely be asserted to be so thoroughly lacking in the sense of moral responsibility or so callous to the ordinary motives of veracity as not to tell the truth (as they see it) in a large or the larger proportion of instances; or, in more accurate analysis, no such defect, if it exists, can be so well ascertainable as to justify us in predicating it for the purpose of exclusion. The second reason is that, even if such a defect existed and were ascertainable, its operation would be so uncertain and elusive that any general rule of exclusion would be as likely in a given instance to exclude the truth as to exclude falsities. It is therefore not a proper foundation for a rule of exclusion.
 
 
 18
 Bedonie, 913 F.2d at 800-01. Instead, the court recognized that "most of the former grounds for excluding a witness altogether have been converted into mere grounds of impeaching his credibility." Id. at 799, quoting McCormick on Evidence Sec. 61, at 155 (3d ed. 1984). Consequently, the jury, with its ability to determine witness credibility, is designated as the arbiter of disputes concerning the reliability of witness testimony.
 
 
 19
 Similarly, in Jenkins, this court was presented with a challenge to the admissibility of testimony given by a government informant who had been diagnosed as a pathological liar. Even though expert testimony established that a pathological liar "lies as part of his life style," the court was able to conclude that "evaluation of Davis' testimony was a matter of credibility for the trier of fact." 525 F.2d at 826.
 
 
 20
 This authority leads us to the conclusion that in the present situation, the district court should not have excluded Bush's testimony solely because of the witness's "inherent unreliability." Instead, after instructing the jury regarding the manner in which witness credibility is to be judged, the court should have allowed the jury to accept or "reject all the testimony of that witness or give it such credibility as ... it deserves." Bedonie, 913 F.2d at 801. Because Bush was effectively unavailable to testify in person before the jury, the prior sworn statements given in a deposition, with the opportunity for cross-examination by the adverse party, should have been introduced into evidence. Moreover, the determinative issue in the trial of this lawsuit was whether Carter procured another individual to set fire to her home. Hence, the refusal of the district court to allow testimony related to that issue cannot be said to be harmless. The judgment in the defendant's favor must therefore be reversed and the case remanded for a new trial.
 
 
 21
 Of course, upon retrial, if Nationwide were to offer Bush's deposition testimony, Carter would be allowed to establish the fact that Bush, on two occasions, repudiated the information in that deposition. If Bush remains "unavailable" to testify, such evidence must, by necessity, come from Nationwide's attorney, John Schwalb, who received the notices of recantation. Furthermore, letters such as those received by Schwalb from Bush would not be considered hearsay under these limited circumstances, because they would not be offered to prove the truth of the matters asserted therein but, rather, to establish only that Bush changed her story regarding the alleged arson on more than one occasion. Presumably, the district court would also then instruct the jury on the proper method of evaluating the impeachment evidence.
 
 
 22
 The only other issue raised on appeal concerns Nationwide's contention that the district court should have directed a verdict in its favor on two questions affecting damages: the cost of debris removal and the amount of damage to the structure. Nationwide insists that there was no evidence concerning the cost of debris removal (which was separately covered under the terms of the policy) and insufficient evidence of the cost of rebuilding the house. Certainly, the evidence on these two points, beyond Carter's testimony concerning the necessity of debris removal and the value she put on the property, must be considered thin at best.
 
 
 23
 However, Carter did testify that the value of her home and property together was approximately $160,000 and that the land alone had an estimated value of $32,000. Gene Large, a licensed general contractor in Tennessee, testified that he examined the Carter home and recommended that, due to the extensive damage caused by the fire, the same structure not be rehabilitated, but that the 3,500-square-foot home be reconstructed from the ground up, at an estimated cost of $168,000. Were it necessary to decide the question, we might well conclude that this testimony was sufficient to allow the jury to determine the actual amount of damage Carter suffered by being forced to rebuild her home. We point out, however, that in view of the necessity of retrial, such a ruling at this point would be advisory at most.
 
 
 24
 Finally, we note that the previous dispute concerning the district court's award of witness fees and other costs in this case has been resolved by agreement of the parties and is no longer before us on appeal.
 
 
 25
 For the reasons set out above, we REVERSE the judgment of the district court and REMAND the case for retrial.
 
 
 
 *
 The Honorable James P. Churchill, United States District Judge for the Eastern District of Michigan, sitting by designation