**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Vinton BEDONIE and Thomas Cly, Defendants–Appellants.**

Nos. 88–2648, 88–2649.

United States Court of Appeals, Tenth Circuit.

Aug. 24, 1990.

David J. Schwendiman, Asst. U.S. Atty. (Dee Benson, U.S. Atty., and Stewart C. Walz, Asst. U.S. Atty., with him on the briefs), Salt Lake City, Utah, for plaintiff-appellee.

Susan L. Foreman, Asst. Federal Public Defender (Michael G. Katz, Federal Public Defender, with her on the briefs), Denver, Colo., for defendant-appellant Vinton Bedonie.

Edward K. Brass, Salt Lake City, Utah, for defendant-appellant Thomas Cly.

Before TACHA, BALDOCK and BRORBY, Circuit Judges.

BRORBY, Circuit Judge.

Defendants-appellants appeal their convictions on two counts of first degree murder in violation of 18 U.S.C. §§ 1111(a), 1153 and 2, and on two counts of using and carrying a firearm in relation to a crime of violence in violation of 18 U.S.C. §§ 924(c), 1153 and 2.

On the morning of December 5, 1987, passers-by discovered two burned-out and still smoldering Navajo police vehicles ("the panels") in a remote area ("Copper Canyon") of the Navajo Indian Reservation in the southeast corner of Utah. The charred remains of two men, later identified as Navajo police officers Roy Lee Stanley and Andy Begay, were found inside one of the panels.

On April 28, 1988, four Navajo Indians—Thomas Cly, Vinton Bedonie, Ben Atene, Jr.[1] and Marques Atene[2]—were each indicted on two counts of first degree murder in the deaths of Stanley and Begay (counts I and II) and two counts of using a firearm in connection therewith (counts III and IV). Specifically, counts I and II charged that appellants

did commit murder in the first degree, in that said defendants unlawfully and with malice aforethought did kill [Roy Lee Stanley and Andy Begay] and did willfully aid, abet, counsel, command, induce, and procure, said killing, by willfully, deliberately, maliciously and premeditatedly murdering said victim and committing said murder in the perpetration of and the attempt to perpetrate arson, escape and murder, by means of setting fire to a truck in which said [victims were] placed after having been shot; all in violation of 18 U.S.C. §§ 1111(a), 1153 and 2.

Trial to a jury commenced July 18, 1988. Dr. Thomas Henry, the government's expert in forensic pathology who performed the postmortem examination of the victims' remains, testified as to the results of his examinations and, based upon those results, expressed his opinion that "Mr. Stanley ... died of smoke inhalation and thermal burns" and that "Mr. Begay died of smoke inhalation and thermal burns."

The testimony of the government's key witnesses to the events leading up to the deaths of Begay and Stanley—Marie Haycock, Martha Chee, Boyd Atene, Raymond Fatt and Julius Crank—revealed that a bonfire party had taken place the night of December 4, 1987. The witnesses saw both appellants at the bonfire. According to Haycock, Chee and Boyd Atene, Officer Stanley arrived at the scene of the bonfire, got out of his police panel, was confronted by appellant Cly, and then was ultimately subdued and handcuffed after a fight involving Cly, appellant Bedonie and Ben Atene, Jr. Haycock, Chee and Boyd Atene each testified that they heard either one or two gunshots after the fight and both Haycock and Boyd Atene saw Bedonie carrying

---

1. The jury was unable to reach a verdict as to defendant Ben Atene, Jr., who was subsequently retried and acquitted of all charges.

2. At the close of the government's case-in-chief, the government moved to dismiss all charges against Marques Atene on the basis of insufficient evidence.

a gun. Boyd Atene testified that, after Stanley had been overcome, Bedonie told Boyd to walk with Bedonie to Stanley's panel. Boyd complied and, after Bedonie opened the driver's side door for him, Boyd got in the panel and Bedonie closed the door.

Haycock, Chee and Boyd Atene testified that Andy Begay arrived shortly thereafter at the bonfire in his police panel. They then heard one or two more gunshots. Haycock testified that she saw Bedonie come up behind Begay, point a gun at him and walk Begay behind his vehicle before she heard the gunshot. Haycock and Chee then left the bonfire scene.

Boyd Atene testified that Cly then got into his own pickup truck, and Bedonie got in on the passenger side of the panel in which Boyd was seated. Bedonie then directed Boyd to drive Stanley's panel away from the bonfire scene and to follow Ben Atene, Jr.'s truck. Boyd and Bedonie were followed in the caravan by Begay's panel.

Boyd Atene testified that the panels were eventually driven down into Copper Canyon until the panel Boyd was driving became stuck in the mud. After trying unsuccessfully to drive the panel out of the mud, Boyd walked away from the truck. Boyd saw Cly and Cly's truck at the Copper Canyon scene. After Bedonie's efforts to free the one panel failed, the second police panel was parked near the first. Boyd testified that appellants became very busy around the police vehicles and that he saw Bedonie take things out of the panels and throw them onto a mesa. Boyd then watched Cly pour gasoline from a five-gallon gas can inside and outside the panels. Boyd saw appellants stand a couple of feet away from the panels and then he saw "a flame of fire." Shortly, there was "a big flame" and the panels were burning. The bodies of Stanley and Begay were found in one of these panels.

The government also presented physical evidence and other testimony tending to corroborate the testimony of Boyd Atene and the other principal witnesses. For example, Boyd testified that officer Stanley was wearing glasses when Stanley arrived at the bonfire scene. A pair of eyeglasses found at the bonfire scene was identified by Stanley's wife as her husband's glasses. The frame, prescription and tint of the glasses matched those of the glasses sold to Stanley in a shop in Flagstaff, Arizona. In addition, Rosie Cly, a Navajo woman who lived near the bonfire site, testified that she heard what sounded like four gunshots coming from that area the night of the murders. Ronald Duncan, the government's expert on forensic chemistry and arson, testified that in his opinion, based upon the distance between the two panels at the Copper Canyon site and the extent to which the vehicles were burned, the fire did not start accidentally and an accelerant was probably used to light the fire.

Both appellants presented an alibi defense. Appellant Bedonie testified that he was at the home of his mother and stepfather, Lilly and Ben Atene, Sr., from about 10 p.m. the night of December 4, 1987, through the following morning. A number of witnesses testified in his behalf that a special Navajo ceremony was performed at the Atene home during the night of December 4 and the early morning of December 5 and that they saw Bedonie at the Atene home during the night. Bedonie denied that he had been at the bonfire or at Copper Canyon. Appellant Cly testified that he was not involved in the killing of either officer and that he spent the evening drinking, watching TV and doing some off-road driving.

Closing arguments were concluded on July 28, 1988. On August 2, 1988, after five days of deliberation, the jury returned a verdict of guilty on all counts charged against appellants. Specifically as to counts I and II of the indictment, the jury found:

[W]e ... find the Defendant, Thomas Cly, (1) guilty as to Count I, murder in the first degree of Roy Lee Stanley, (2) guilty as to Count II, murder in the first degree of Andy Begay....

As to Defendant, Vinton Bedonie, we ... find the Defendant ... (1) guilty as to Count I, murder in the first degree of Roy Lee Stanley, (2) guilty as to Count

II, murder in the first degree of Andy Begay.... Dated August 1st, 1988.

The court polled the individual jury members and each juror indicated his/her agreement with the verdict as to each count. Appellants were each sentenced to two concurrent terms of life imprisonment on counts I and II, one five-year term of imprisonment on count III to run consecutively with the sentence imposed as to counts I and II, and one five-year term on count IV to run consecutively with the sentence imposed as to counts I, II and III.

Mr. Bedonie appeals his conviction on the following two bases: (1) The trial court lacked jurisdiction to try appellant for first degree murder committed in the perpetration of arson; and (2) appellant was deprived of his right to a unanimous verdict. Appellant Cly joins in the arguments made by appellant Bedonie.

Mr. Cly appeals his conviction on the following five bases: (1) Appellant's Sixth Amendment rights were violated in that the jury was selected from a venire in which Native Americans were underrepresented; (2) appellant's Fourteenth Amendment rights were violated through the use of a peremptory challenge to remove the only partial Native American from the jury; (3) the district court erred in denying appellant's challenges "for cause" of four venire persons; (4) the failure to exclude incompetent government witnesses was reversible error, and the failure to exclude their irrelevant testimony was an abuse of discretion by the district court; and (5) the district court erroneously admitted evidence of the appellant's character for honesty. Appellant Bedonie adopts by reference all arguments made by appellant Cly as they may apply to Mr. Bedonie.

I

Appellants first argue that "the trial court lacked jurisdiction to try [appellants] for first-degree murder committed in the

perpetration of arson." The relevant jurisdictional statute, 18 U.S.C. § 1153, provides:

**Offenses committed within Indian country**

(a) Any Indian who commits against the person or property of another Indian or other person any of the following offenses, namely, ..., arson, ... shall be subject to the same law and penalties as all other persons committing any of the above offenses, within the exclusive jurisdiction of the United States.

(b) Any offense referred to in subsection (a) of this section that is not defined and punished by Federal law in force within the exclusive jurisdiction of the United States shall be defined and punished in accordance with the laws of the State in which such offense was committed as are in force at the time of such offense.

The crime of murder is defined and punished by federal law via 18 U.S.C. § 1111, which provides in relevant part:

(a) Murder is the unlawful killing of a human being with malice aforethought. Every murder perpetrated by ... any ... kind of willful, deliberate, malicious, and premeditated killing; or committed in the perpetration of, or attempt to perpetrate, any arson, escape, murder, kidnaping, treason, espionage, sabotage, aggravated sexual abuse or sexual abuse, burglary, or robbery ... is murder in the first degree.

The jury instructions set forth in part the statutory language of 18 U.S.C. § 1111(a): "Murder is the unlawful killing of a human being with malice aforethought. Every murder perpetrated by ... premeditated killing; or committed in the perpetration of ... any arson ... is murder in the first degree." The court specifically instructed the jury as to the elements of both premeditated murder [3] and arson-murder.[4] Em-

---

**3.** The court's instruction on premeditated murder read:

The first way first degree murder can be committed is premeditated murder. In order to establish first degree murder in this manner, the following essential elements must be proven beyond a reasonable doubt:

**1.** That the defendants killed or aided and abetted in the killing of a human being unlawfully;

---

**4.** See note 4 on page 788.

ploying the language of Utah Code Ann. § 76–6–102(1)(b) (1986 Repl.), the court instructed that "[a] person is guilty of arson if ... by means of fire or explosives, he unlawfully and intentionally damages the property of another."

Appellants assert that, in establishing arson-murder under § 1111(a), "[t]he only arson which is jurisdictionally proper for 'Indian country' is 18 U.S.C. § 81," and "[b]y its own terms, [§ 81] does not apply to setting fire to motor vehicles." 18 U.S.C. § 81 provides in relevant part:

> Whoever, within the special maritime and territorial jurisdiction of the United States, willfully and maliciously sets fire to or burns, ... any building, structure or vessel, any machinery or building materials or supplies, military or naval stores, munitions of war, or any structural aids or appliances for navigation or shipping, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

We agree with appellants that § 81 is the only proper arson statute under which an Indian may be prosecuted for arson-murder under 18 U.S.C. §§ 1111(a) and 1153; however, we do not interpret § 81 as excluding the burning of a motor vehicle from its arson definition.

## A

■ The government argues that the "any arson" language of § 1111(a) "does not limit arson to the arson contemplated by either 18 U.S.C. § 1153 or 18 U.S.C. § 81." We disagree. First, we find it extremely significant that § 1111(a) enumerates eleven separate crimes within its "felony-murder" provision, every one of which is defined and punishable under a separate section of Title 18 of the United States Code.[5] As such, we consider it highly unlikely that Congress intended, through the insertion of the word "any" in § 1111(a), to allow the federal definitions of the predicate crimes for felony-murder to be ignored in favor of definitions supplied by state and local statutes.

■ Taken to its logical limits, the government's argument would allow a defendant charged with arson-murder under § 1111(a) to be charged and convicted under the provisions of any arson statute—federal, state or local—in the United States. Presumably, the government would be free to select the statute with the definition most favorable to prosecution. Thus, if the "any arson" language of § 1111(a) means, as the government implicitly suggests, "any statutory definition of arson—federal or state," then the district

---

2. That the defendants did such act or acts with malice aforethought;

3. That the defendants did such act or acts with premeditation;

4. That the act or acts were committed within the exterior boundaries of an Indian Reservation and that the defendants and the victims are Indians.

The court further instructed the jury as to the definitions of malice aforethought, malice and premeditation.

4. The court's instruction on arson-murder read:

The second way first degree murder can be committed is during the perpetration of certain other crimes. Such other crimes include arson, escape, murder and kidnapping, but the crime relevant to this case is arson. In order to establish first degree murder in this manner the following essential elements must be proven beyond a reasonable doubt:

1. That the defendants killed or aided and abetted in the killing of a human being unlawfully;

2. That the defendants did such act or acts with malice aforethought;

3. That the defendants did such act or acts in the perpetration or attempted perpetration of an arson;

4. That the act or acts were committed within the exterior boundaries of an Indian Reservation and that the defendants and the victims are Indians.

. . . .

The element of premeditation is not an element in the offense of first degree murder when a defendant does such act or acts in the perpetration or attempted perpetration of an arson. . . . However, it would have to be established that a defendant perpetrated or attempted to perpetrate an arson as an essential element of this way of committing first degree murder.

5. See 18 U.S.C. § 81 (arson); § 751 (escape); § 1111 (murder); § 1201 (kidnaping); § 2381 (treason); §§ 793–799 (espionage (and censorship)); §§ 2151–2157 (sabotage); § 2241 (aggravated sexual abuse); § 2242 (sexual abuse); §§ 2111–2118 (burglary and robbery).

court here could have instructed the jury on the elements of arson as defined by Florida or Vermont. Such a construction of § 1111(a), when Congress has supplied federal definitions for each of the predicate crimes, would be patently absurd. Accordingly, we hold that, in prosecuting a defendant for first degree murder under the "felony-murder" provision of § 1111(a), the predicate crime shall be defined by reference to the appropriate federal statute—in this case, the federal arson statute, 18 U.S.C. § 81.

■ Our holding gains added force in the context of an Indian prosecution when § 1111 is read in conjunction with § 1153. Section 1153(a) provides that an Indian committing arson is "subject to the same law ... as all other persons committing [arson] within the exclusive jurisdiction of the United States." Section 1153(b) allows an offense to "be defined and punished in accordance with the laws of the State in which such offense was committed" when an "offense referred to in subsection (a) of this section [including arson] ... is not defined and punished by Federal law in force within the exclusive jurisdiction of the United States." The provisions of § 81 and § 1111, respectively, establish the law of arson and murder "within the special maritime and territorial jurisdiction of the United States." Accordingly, under § 1153(a), an Indian who commits arson and murder against the person or property of another Indian or other person must be prosecuted under the provisions of § 81 and § 1111, respectively. We do not interpret § 1153 as allowing an exception—thus permitting an Indian to be prosecuted under a nonfederal definition of arson—when the two crimes are combined as arson-murder under § 1111(a).

**B**

Although we agree with appellants that § 81 provides the appropriate definition of arson for purposes of the arson-murder provision of § 1111, we disagree with appellants' contention that federal jurisdiction fails in this case because § 81 fails to criminalize the burning of a motor vehicle.

In general, penal statutes must be strictly construed, *Yates v. United States,* 354 U.S. 298, 304, 77 S.Ct. 1064, 1069, 1 L.Ed.2d 1356 (1957), and " 'the words of statutes ... should be interpreted where possible in their ordinary, everyday sense[ ].' " *Hanover Bank v. Commissioner,* 369 U.S. 672, 687, 82 S.Ct. 1080, 1089, 8 L.Ed.2d 187 (1962) (quoting *Crane v. Commissioner,* 331 U.S. 1, 6, 67 S.Ct. 1047, 1051, 91 L.Ed. 1301 (1947)).

■ Section 81 defines arson to include the willful and malicious burning of "any machinery." Machinery is not defined by the statute. However, in our opinion, the plain and ordinary language of § 81 criminalizes the burning of a motor vehicle.[6] Webster defines "machinery" as "[m]achines or machine parts in general" and defines "machine" to include "[a] device or system along with its source of power and auxiliary equipment, as a motor vehicle." Webster's II *New Riverside University Dictionary* 712 (1984). To be sure, the definitions of other dictionaries may not specifically mention a motor vehicle; nevertheless, this court will not hold that a motor vehicle is *not* a machine.

To our knowledge, the only other case to address whether § 81 criminalizes the burning of a motor vehicle is *United States v. Banks,* 368 F.Supp. 1245 (D.S.D.1973). There, the district court concluded: "The term 'machinery' as used within [§ 81] cannot be taken so out of the context of its surrounding words to include 'motor ve-

6. The government argues that "[i]f no Federal law in force at the time defined and punished the offense of arson where the property involved was a motor vehicle, [§ 1153(b)] required the application of Utah State law for determining whether jurisdiction existed and for the definition of the crime." We cannot accept the government's argument. Section 1153(b) provides "[a]ny offense referred to in

subsection (a) of this section that is not defined and punished by Federal law ... shall be defined and punished in accordance with the laws of the State in which such offense was committed." Arson is an offense referred to in subsection (a) of § 1153 and is defined and punished by federal law through § 81, thus subsection (b) is inapplicable to the offense of arson and State law need not be referenced.

hicle.' To do so would ignore the long-standing principle of statutory construction of *ejusdem generis* [7] and endanger the constitutionality of the Act on its face." *Id.* at 1248 (citation omitted, footnote added). The *Banks* court also opined that to classify a motor vehicle as machinery for purposes of § 81 "would raise grave constitutional questions as to the vagueness of [§ 81]." *Id.* (citing *Papachristou v. City of Jacksonville*, 405 U.S. 156, 162, 92 S.Ct. 839, 843, 31 L.Ed.2d 110 (1972); *Coates v. City of Cincinnati*, 402 U.S. 611, 615, 91 S.Ct. 1686, 1689, 29 L.Ed.2d 214 (1971); and *United States v. Harriss*, 347 U.S. 612, 617, 74 S.Ct. 808, 812, 98 L.Ed. 989 (1954)).

■ We disagree with the *Banks* decision on both points. First, under a plain reading of § 81, we cannot agree that the many terms surrounding the term "machinery" somehow restrict the meaning of "machinery" so as to exclude a motor vehicle from its definition. Second, *Harriss* establishes that, in order to meet the constitutional requirement of definiteness in a criminal statute, the statute must "give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute." 347 U.S. at 617, 74 S.Ct. at 812. Having concluded above that the "plain and ordinary meaning of § 81 criminalizes the burning of a motor vehicle," we likewise conclude that the statute's terms provide sufficient notice under *Harriss* that the burning of or setting fire to a motor vehicle is forbidden by § 81.

Accordingly, we hold that the district court had jurisdiction under § 1153, § 1111(a) and § 81 to entertain the prosecution of appellants under a theory of arson-murder.

### C

In light of the foregoing conclusion and related discussion, we find it appropriate to address two additional issues not raised by the parties: (1) whether the indictment, which does not specifically reference § 81,

is sufficient to state a federal offense; and (2) whether the court's instruction on arson, which stated the law of arson based on the Utah statute, is legally sufficient.

Because neither of these issues was addressed by the trial court, we must conduct our review thereof under the plain error standard of Fed.R.Crim.P. 52(b), which provides: "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."

The plain-error doctrine ... tempers the blow of a rigid application of the contemporaneous-objection requirement. The Rule authorizes the Courts of Appeals to correct only "particularly egregious errors," those errors that "seriously affect the fairness, integrity or public reputation of judicial proceedings." In other words, the plain-error exception ... is to be "used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result."
...
Especially when addressing plain error, a reviewing court cannot properly evaluate a case except by viewing such a claim against the entire record.

*United States v. Young*, 470 U.S. 1, 15–16, 105 S.Ct. 1038, 1046–47, 84 L.Ed.2d 1 (1985) (citations, footnote omitted).

With the above standards in mind, we turn first to the sufficiency of the indictment. An indictment is constitutionally sufficient if it passes the following two-part test:

"First, the indictment must contain the elements of the offense and sufficiently apprise the defendant of what he must be prepared to meet; second, it must be such as to show to what extent he may plead a former acquittal or conviction as a bar to further prosecution for the same cause."

*United States v. Salazar*, 720 F.2d 1482, 1486 (10th Cir.1983), *cert. denied*, 469 U.S. 1110, 105 S.Ct. 789, 83 L.Ed.2d 783 (1985)

---

7. "The doctrine of *ejusdem generis* provides that 'when there are general words following particular and specific words, the former must be confined to things of the same kind.'" *United*

*States v. Freeman*, 473 F.2d 7, 9 (8th Cir.1973) (quoting Sutherland, *Statutory Construction*, 814 (2d ed. J. Lewis 1904)).

(quoting *United States v. Radetsky*, 535 F.2d 556, 562 (10th Cir.), *cert. denied*, 429 U.S. 820, 97 S.Ct. 68, 50 L.Ed.2d 81 (1976)); *see also Hamling v. United States*, 418 U.S. 87, 117, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974); *United States v. Smith*, 788 F.2d 663, 667 (10th Cir.1986).

■ "An indictment generally is sufficient if it sets forth the offense in the words of the statute so long as the statute adequately states the elements of the offense" intended to be punished. *Salazar*, 720 F.2d at 1486 (citing *Hamling*, 418 U.S. at 117, 94 S.Ct. at 2907). The indictment here did not specifically reference § 81 or incorporate its exact language. Instead, the indictment charged that appellants "willfully, deliberately, maliciously and premeditatedly murder[ed] [Stanley and Begay] and committ[ed] said murder in the perpetration of and the attempt to perpetrate arson ... by means of setting fire to a truck." If the indictment had fused the exact language of §§ 1111(a) and 81, it would have produced a more perfect statement of the offense; however, we conclude the indictment sufficiently charged the federal offense of arson-murder under §§ 1111(a) and 81. The indictment sufficiently apprised appellants of the offense charged and the elements thereof.

We next address whether the district court's instruction to the jury regarding the elements of arson constituted plain error. When examining the sufficiency of a jury instruction, "we review the record as a whole to determine whether the instruction[ ] state[d] the law that governs and provided the jury with an ample understanding of the issues and standards applicable." *United States v. Suntar Roofing, Inc.*, 897 F.2d 469, 473 (10th Cir.1990).

■ As previously set forth in this opinion, the court appropriated the language of Utah's arson statute, § 76–6–102(1)(b), to instruct the jury that "[a] person is guilty of arson if ... by means of fire or explosives, he unlawfully and intentionally damages the property of another." 18 U.S.C. § 81 punishes one who "willfully and maliciously sets fire to or burns, or attempts to

set fire to or burn ... any machinery." Additionally, § 1153(a) applies the terms of § 81 to an Indian "who commits [arson] against the person or property of another Indian or other person." Thus, the only difference this court can discern between the instruction given by the district court under Utah law and the exact definition contained in § 81 is in the instruction's use of the words "unlawfully" and "intentionally" instead of § 81's "willfully" and "maliciously." We cannot conclude that this difference, which amounts to a difference between synonyms, constitutes an incorrect statement of the law of arson under § 81 rising to the level of plain error.

## II

■ Appellants next contend they were deprived of their right to a unanimous verdict.[8] Specifically, appellants assign as error the district court's use of "verdict forms [that] only provided for findings of guilty or not guilty as to first-degree murder generally" when the jury was instructed as to two separate theories for establishing first-degree murder. Appellants' contention was not raised before the district court; therefore, we must review appellants' argument under the plain error standard.

As to the unanimity of the verdicts, the district court instructed the jury: "The verdict must represent the considered judgment of each juror. In order to return a verdict, it is necessary that each juror agree thereto. Your verdict must be unanimous"; "[b]ear in mind also that you are never to reveal to any person—not even to the Court—how the jury stands numerically or otherwise, until you have reached a unanimous verdict"; and "[y]ou will take the verdict form to the jury room and when you have reached unanimous agreement as to your verdict, you will ... then return to the courtroom."

In our opinion, the trial court's use of a general unanimity instruction in this case did not constitute plain error. Fed.R. Crim.P. 31(a) provides: "The verdict shall

---

**8.** Fed.R.Crim.P. 31(a) sets forth the right to a unanimous verdict.

be unanimous. It shall be returned by the jury to the judge in open court." However, "[i]n this circuit as in most others, 'it is assumed that a general instruction on the requirement of unanimity suffices to instruct the jury that they must be unanimous on whatever specifications they find to be the predicate of the guilty verdict.' " *United States v. Phillips*, 869 F.2d 1361, 1366 (10th Cir.1988), *cert. denied*, —— U.S. ——, 109 S.Ct. 2074, 104 L.Ed.2d 638 (1989) [9] (quoting *United States v. McClure*, 734 F.2d 484, 494 (10th Cir.1984)). *See also United States v. Payseno*, 782 F.2d 832, 835 (9th Cir.1986); *United States v. Williams*, 737 F.2d 594, 614 (7th Cir.1984), *cert. denied*, 470 U.S. 1003, 105 S.Ct. 1354, 84 L.Ed.2d 377 (1985); *United States v. Barton*, 731 F.2d 669, 672–73 (10th Cir. 1984); [10] *United States v. Johnson*, 713 F.2d 633, 646 n. 14 (11th Cir.1983), *cert. denied*, 465 U.S. 1081, 104 S.Ct. 1447, 79 L.Ed.2d 766 (1984); *United States v. Murray*, 618 F.2d 892, 898 (2d Cir.1980). "Therefore, we assume that the jury unanimously reached a decision as to all factual predicates on which it based [appellants'] conviction[s]." *Phillips*, 869 F.2d at 1367. " 'In the absence of an appropriate unanimity instruction tendered by [appellants], we will not reverse the convictions on the ground of faulty instruction.' " *Id.* (quoting *Williams*, 737 F.2d at 614).

Other circuits have made exceptions to the general rule,[11] "but only the Ninth Circuit [in *Payseno*, 782 F.2d at 836–37] has held the lack of a specific unanimity instruction to be plain error." *Phillips*, 869 F.2d at 1367. In *Payseno*, the Ninth Circuit held:

> In the present case, there exists the genuine possibility that some jurors may have believed Payseno used extortionate means on one occasion while others may have believed that he was guilty of engaging in extortion at a different time and place....
>
> The three acts of extortion in this case were directed at separate victims, occurred at different times and different locations, involved different methods of communicating the threats, and were carried out by varying numbers of individuals.

782 F.2d at 837.

Even if the *Payseno* exception were the rule of this circuit, we hold that a general unanimity instruction would still be sufficient in this case. *Cf. Phillips*, 869 F.2d at 1367. The Ninth Circuit rule states: " 'When it appears ... that there is *a gen-*

---

**9.** In *Phillips,* the defendant was convicted of knowingly and willfully transporting in interstate commerce forged and falsely made securities—two bad checks—with intent to defraud in violation of 18 U.S.C. § 2314. "[T]he jury instructions allowed the jury to find the check[s] falsely made and forged if, (1) the maker of the check was not authorized to sign on the account ...; (2) the check was drawn on a closed account; or (3) the check was made payable to a fictitious payee." 869 F.2d at 1364. The defendant argued on appeal that the jury instructions—including a general unanimity instruction—deprived him of a unanimous verdict, but did not object at trial or proffer a more specific unanimity instruction. 869 F.2d at 1366.

**10.** In *Barton,* the defendant was convicted of possessing a firearm after having been convicted of a felony, in violation of 18 U.S.C. § 1202(a). At trial, the government presented evidence tending to establish possession under either an *actual* possession or *constructive* possession theory. The defendant contended on appeal that the trial court erred by refusing to instruct the jurors that they were required to unanimously agree on the theory supporting conviction. In concluding that the trial court's general unanimity instruction was sufficient, 731 F.2d at 673, this court observed:

> The relevant act prohibited by the statute is "possession," which encompasses both actual and constructive possession.... Actual and constructive possession are not alternative crimes under the statute. Rather, they provide different means or theories by which the offense of "possession" may be proved.

731 F.2d 672–73 (citations omitted).

**11.** *See, e.g., United States v. Beros,* 833 F.2d 455, 462 (3d Cir.1987) ("[w]hen the government chooses to prosecute under an indictment advancing multiple theories ... [i]t cannot rely on a composite theory of guilt, producing twelve jurors who unanimously thought the defendant was guilty but who were not unanimous in their assessment of which act supported the verdict"); *United States v. Ryan,* 828 F.2d 1010, 1020 (3d Cir.1987) ("in any case where a count will be submitted to the jury on alternative theories, prudence counsels the trial court to give an augmented unanimity instruction if the defendant requests such a charge"); *United States v. Gipson,* 553 F.2d 453, 458–59 (5th Cir.1977).

*uine possibility of jury confusion* or that a conviction may occur as the result of different jurors concluding that the defendant committed different acts, the general unanimity instruction does not suffice.' " *Payseno,* 782 F.2d at 836 (quoting *United States v. Echeverry,* 719 F.2d 974, 975 (9th Cir.1983) (emphasis in *Payseno* )). Here, the government's evidence raises no possibility of jury confusion as to the acts forming the basis for the charge of first degree murder. The evidence focused on one night—December 4, 1987, two victims—Roy Lee Stanley and Andy Begay, one method of killing—fire, one cause of death—smoke inhalation and thermal burns, one place where the killings were accomplished—Copper Canyon, and one vehicle in which both victims died.

Appellants contend that a possible source of jury disagreement or confusion as to the basis for the first degree murder verdict is the different states of mind required by the two first-degree murder theories given in the instructions—i.e., premeditated murder requires proof of premeditation, whereas arson-murder requires proof only of the elements of arson, including the intent to damage the property of another. *See infra* note 4. However, our review of the record in this case leads us to two conclusions which negate appellants contention: (1) There was no evidence presented from which the jury could have concluded that appellants killed Stanley and Begay *without* premeditation; and (2) even if some of the jurors reached a verdict based on a theory of arson-murder and the others founded their verdict on a theory of premeditated murder, the jury necessarily would have unanimously found the elements of arson-murder.

First, the government's evidence presented only one version of the events leading to the deaths of officers Stanley and Begay:

After subduing and otherwise diabling the victims at the bonfire site, appellants and others drove the officers and their police panels approximately twenty-two miles to the Copper Canyon site; once at Copper Canyon, the testimony and other evidence indicated that the vehicles were deliberately set aflame with the police officers therein. Because the defense argued that neither appellant was at the bonfire or Copper Canyon the night of the killings, there is no evidence in the record to suggest that the fire started accidentally, that appellants intentionally set fire to the panels without knowledge that the victims were inside, or that appellants intentionally set fire to the vehicles with the mistaken belief that the victims were already dead.[12] Thus, based on the evidence presented by the prosecution, a determination that appellants intentionally set fire to or burned the police panels also necessarily establishes premeditation to kill.

Second, even if the evidence permitted the jury to be split as to the theory underlying the first-degree murder conviction, the elements of arson-murder would necessarily have been established in the minds of all twelve jurors. Again, the only method of killing charged and supported by evidence is the burning of the vehicles. Thus, in order for a juror to have concluded that appellants were guilty of premeditated murder, he/she would necessarily have had to find that appellants intentionally set fire to the panels.

### III

■ Although the issue was not raised before the district court, appellants next argue that their "Sixth Amendment right to a jury selected from a fair cross-section of the community" was violated and that said violation amounts to plain error. Ap-

---

**12.** Appellants did not contest the expert testimony of Dr. Henry as to the cause of death at trial and do not attempt to do so on appeal. The only evidence remotely suggesting that the victims could have died before the panels were set on fire was the testimony of Marie Haycock that, when asked by Bedonie to "[t]urn [Stanley] over to see if he's dead," Haycock touched Stanley and told appellants that Stanley was dead.

However, in response to the prosecutor's further questions, Haycock admitted that she did not know whether Stanley was dead and told appellants that he was dead only because she "didn't want them to do any more shooting at him." During cross-examination, she stated, "I thought he was dead, but I wasn't sure. I just said he was dead because I didn't want them to do anymore thing."

pellants' argument is directed at the facts that there were no Native Americans among the 120 persons on the venire and the only "person who professed some fraction of Native American heritage ... was not seated on the jury."

Those tried in a federal court have a right to a jury "selected at random from a fair cross section of the community in the district or division wherein the court convenes." 28 U.S.C. § 1861. "No citizen shall be excluded from service as a ... juror in the district courts of the United States ... on account of race, color, religion, sex, national origin, or economic status." 28 U.S.C. § 1862.

28 U.S.C. § 1863(a) requires "[e]ach United States district court [to] 'devise and place into operation a written plan for random selection of grand and petit jurors that shall be designed to achieve the objectives of [§ 1861 and § 1862].'" Such a plan has been devised and was in operation in the United States District Court for the District of Utah at the time of appellants' trial.

28 U.S.C. § 1867(e) provides:

The procedures prescribed by this section shall be the exclusive means by which a person accused of a Federal crime, the Attorney General of the United States or a party in a civil case may challenge any jury on the ground that such jury was not selected in conformity with the provisions of this title [the Federal Jury Selection and Service Act ("the Act"), 28 U.S.C. §§ 1861–1878].

Section 1867(e) "provides the exclusive means for a party charged with a federal crime to challenge a jury." *United States v. Cooper*, 733 F.2d 1360, 1366 (10th Cir.), *cert. denied*, 467 U.S. 1255, 104 S.Ct. 3543, 82 L.Ed.2d 847 (1984).

Section 1867(a) sets forth the applicable time limitations for a criminal defendant's challenge: "In criminal cases, before the voir dire examination begins, or within seven days after the defendant discovered or could have discovered, by the exercise of diligence, the grounds therefor, whichever

is earlier, the defendant may move to dismiss the indictment or stay the proceedings against him...." The defendant's motion must contain a "sworn statement of facts which, if true, would constitute a substantial failure to comply" with the Act. Section 1867(d).

Appellants did not challenge the venire or the selection of the jury in this case before the district court—much less in a manner consistent with the procedures prescribed by § 1867(a) and (d). "If a party fails to comply with the statutory procedures [of § 1867], a court may not hear the claim." *United States v. Martinez–Nava*, 838 F.2d 411, 413 (10th Cir.1988). *See also Cooper*, 733 F.2d at 1366.

## IV

In another issue not raised before the district court, appellants assert that their Fourteenth Amendment rights were violated when the only venireperson with some Native American heritage was removed from the jury by peremptory challenge. This challenge must also be reviewed for plain error.

Venirepersons cannot be stricken from a jury by the prosecutor "solely on account of their race or on the assumption that [jurors of a particular race] as a group will be unable impartially to consider the State's case against a [defendant of the same race]." *Batson v. Kentucky*, 476 U.S. 79, 89, 106 S.Ct. 1712, 1719, 90 L.Ed.2d 69 (1986). To establish a prima facie case of purposeful discrimination, the defendant must show: first, "that he is a member of a cognizable racial group"; second, "that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race"; and third, "that these facts and any other relevant circumstances raise an inference that the prosecutor used [peremptory challenges] to exclude the veniremen from the petit jury on account of their race." *Id.* at 96, 106 S.Ct. at 1723.[13] "Once the defendant

---

**13.** "[T]he defendant is entitled to rely on the fact ... that peremptory challenges constitute a jury selection practice that permits 'those to

discriminate who are of a mind to discriminate.'" *Batson*, 476 U.S. at 96, 106 S.Ct. at 1723

makes a prima facie showing, the burden shifts to the State to come forward with a neutral explanation" for its peremptory challenges. *Id.* at 97, 106 S.Ct. at 1723.

 Appellants have met the first burden under *Batson*—appellants, as members of the Navajo tribe, are members of a recognizable racial group. *United States v. Yazzie,* 660 F.2d 422, 426 (10th Cir.1981), *cert. denied,* 455 U.S. 923, 102 S.Ct. 1282, 71 L.Ed.2d 464 (1982). However, appellants have failed to meet the second and third phase of their burden under *Batson.* There is no evidence in the record to support appellants' assertion that the person removed via the government's peremptory challenge—Jane Bridge—is a member of appellants' racial group. Appellants contend that Ms. Bridge is half Comanche, however, there is no evidence to support this contention in the record. Additionally, appellants have failed to show that the government's use of a peremptory challenge in removing Ms. Bridge was motivated by any other than a racially neutral reason. Appellants direct us to no facts in the record from which we can infer a discriminatory purpose on the part of the prosecution in removing Ms. Bridge by peremptory challenge. Appellants have failed to meet their burden under *Batson* and certainly have not established plain error.

## V

Appellant Cly next contends that the trial court erred in denying appellants' challenges "for cause" against four venirepersons—Norma Robinson, Robert Stewart, Faye Cypert and Max Anderson. Denied his challenges "for cause," appellant Cly removed the four venirepersons from the panel by peremptory challenge. Appellants contend: "It is axiomatic that, as a general rule, it is error for a Court to force a party to exhaust his peremptory challenges on persons who should be excused for cause." Appellant Cly more specifically contends the trial court abused its discretion in not conducting a more thorough investigation of the four jurors' ability to

(quoting *Avery v. Georgia,* 345 U.S. 559, 562, 73

serve after appellant gave his reasons for challenging the jurors for cause.

 Trial court decisions concerning the seating or excusing of jurors are "in the discretion of the trial court, and such decisions will be reversed only where there has been an abuse of discretion." *Anderson v. Dun & Bradstreet, Inc.,* 543 F.2d 732, 734 (10th Cir.1976). A court must grant a challenge for cause if, by express admission or proof of specific facts, actual prejudice or bias is shown. *United States v. Nell,* 526 F.2d 1223, 1229 (5th Cir.1976).

"The scope of voir dire examination is [also] a matter within the sound discretion of the trial judge and will not be disturbed on appeal absent a clear showing of abuse of discretion." *United States v. Espinosa,* 771 F.2d 1382, 1405 (10th Cir.), *cert. denied,* 474 U.S. 1023, 106 S.Ct. 579, 88 L.Ed.2d 561 (1985). The court's discretion will not be disturbed " 'unless it appears from the record that [the court's] voir dire was inadequate to properly test the qualifications and competency of the prospective jurors to sit on trial of the case.' " *United States v. Hill,* 526 F.2d 1019, 1025 (10th Cir.1975), *cert. denied,* 425 U.S. 940, 96 S.Ct. 1676, 48 L.Ed.2d 182 (1976) (quoting *Brundage v. United States,* 365 F.2d 616, 618 (10th Cir.1966)); *see also Nell,* 526 F.2d at 1229 ("the relevant inquiry is 'whether the procedure used for testing impartiality created a reasonable assurance that prejudice would be discovered if present' " (quoting *United States v. Dellinger,* 472 F.2d 340, 367 (7th Cir.1972), *cert. denied,* 410 U.S. 970, 93 S.Ct. 1443, 35 L.Ed.2d 706 (1973))).

 Based upon our review of the record in this case, we are unable to find an abuse of discretion on the part of the trial court in either the scope of his examination of each juror or in his decision to deny appellant's challenges "for cause."

Before voir dire was conducted, written questionnaires were completed by the jurors under oath and reviewed by the court and counsel for both parties. Appellant

S.Ct. 891, 893, 97 L.Ed. 1244 (1953)).

challenged Ms. Robinson for cause because she "indicated a prejudice ... based on race." The questionnaire and voir dire of Ms. Robinson revealed that she would not like her daughter to date or marry a Navajo. When asked to explain why, she replied, "Oh, I don't know, just being different," and that it was "[j]ust a feeling." When questioned by the court as to her feelings about criminal defense attorneys and prosecutors, the juror responded that she didn't "know much about it." The court then asked, "You just don't have any feelings one way or the other, is that what you meant to say?" and Ms. Robinson responded, "Yes." The court asked, "Do you feel that you could be totally fair and impartial as a juror if you were selected?" Ms. Robinson responded, "I would try very hard." The court continued, "And remove any other consideration whatsoever, so that there would be totally fair and just consideration based only on the evidence?" Ms. Robinson responded, "Yes."

Appellants next contend that the court abused its discretion by declining to probe whether Mr. Stewart's comments "indicated some preconceived notion of guilt or a misunderstanding of the burden of proof." Appellants challenged Mr. Stewart for cause because "he [didn't] understand the burden of proof" and because he would infer guilt "from the mere fact that charges had been filed." In his responses to the written questionnaire, Mr. Stewart expressed his belief that it would be difficult for a criminal defense attorney "to remain totally objective and believe in the client." The court's examination of Mr. Stewart proceeded as follows:

THE COURT: You understand, don't you, that in our system, everyone who is charged with a crime has a right to have their day in court, and they have a right to have a defense brought and to require the Government to prove, shoulder the proof and prove its case. You understand all of that?

THE JUROR: Yes, I do, sir.

THE COURT: And that is the job of defense counsel, you understand that?

THE JUROR: Yes.

THE COURT: Would the fact that the defense counsel is oriented to do that kind of job, color you against the defense or cause you to have any bias in this case in any way?

THE JUROR: No, I would have to do my job.

Appellants challenged Ms. Cypert for cause because she indicated in her responses to the written questionnaire that she thought a person charged with a crime would naturally say anything to put the blame on someone else: "Naturally they would; he would like to get out of the blame." Additionally, she answered in her questionnaire that she thought "law enforcement officers ... would be more likely to tell the truth than ... other people because they have been sworn to tell the truth." The court explored what Ms. Cypert meant by both statements:

THE COURT: ... Do you feel that a law enforcement officer would tell more of the truth than someone else or would you be willing to regard anyone who may have had an opportunity to observe facts as having the same weight in their testimony as a law enforcement officer?

THE JUROR: Well, I should think all would but of course they have had more experience, I guess.

THE COURT: Do you feel that because a person is a law enforcement officer then that there is some advantage that ought to be taken from that fact as opposed to other people who aren't law enforcement officers who would also be claiming to have firsthand knowledge of something?

THE JUROR: Well, I think it turns out to be that way a lot of the time.

THE COURT: And what do you mean by it turns out to be that way?

THE JUROR: Well, I don't know how to explain it, really.

THE COURT: Just what do you think about the relative worth of testimony comparing law enforcement officers to other people. Just give us your own words.

THE JUROR: I don't know what you mean by that.

THE COURT: Well do you think they are going to tell the truth more than other people just because they're law enforcement officers?

THE JUROR: Well, no, not really, not really, I guess.

THE COURT: What we want to be sure of in this kind of question to you is that one side or the other doesn't have some undue advantage.

THE JUROR: No.

THE COURT: Simply because someone happens to be labeled an FBI agent and all of a sudden you say: He's got to be telling the truth, is that the attitude?

THE JUROR: No, I don't mean that.

THE COURT: You don't mean that?

THE JUROR: No, I don't mean that at all.

THE COURT: You would be willing to listen to all of the witnesses and give people credibility based upon what they actually say and all of the other facts concerning the case?

THE JUROR: Oh, certainly, certainly.

The court asked Ms. Cypert whether she had any comments to make about her statement that a person charged with a crime would naturally say anything to get out of the blame. When Ms. Cypert replied "[n]o," the court asked whether any of the counsel present had a question about her answer. Counsel for one of the defendants responded, "No." The court then asked Ms. Cypert, "Do you feel you could be fair and impartial in every way in this case casting aside any preconceived notions and effectively serve as a juror?" Ms. Cypert responded, "Yes, I do."

 Finally, appellants contend the district court "interrupted Mr. Anderson before it could be determined whether he believed innocent people can be charged with crimes or whether he understood the burden of proof." Appellants moved to excuse Mr. Anderson for cause because "he expressed an opinion that everybody that's charged to a greater or lesser degree is guilty." The court's examination of Mr. Anderson proceeded as follows:

THE COURT: All right. You answered with respect to criminal defense attorneys: Some of them should not defend a person if he had admitted guilt privately. That's your feeling because—what is your feeling in that regard? Suppose a person is 100 percent guilty. Don't you think he still has a right to a trial?

THE JUROR: I think he should plead guilty.

THE COURT: Do you think that the Government should be excused from having the evidence, the burden of proof to prove that he's guilty?

THE JUROR: I think that depends upon his attorney, whether he's admitted to the attorney that he's guilty. I think that the attorney ought to plead guilty. That's my opinion.

THE COURT: The thing that we want to call to your attention is that sometimes, you know, a lot of people say they're guilty and if we were to take their guilty pleas, we might be in real bad shape unless we're positive that it's correct and the evidence is there. We have a system that requires a burden of proof and presumption of innocence and things of that nature. Are you in disagreement with that?

THE JUROR: No. I think there are circumstances that would tend to say he may not be as guilty as he thought he was, but circumstances could prove that it wasn't his fault some way, but I know—

THE COURT: Have you formed any kind of opinion with respect to the defendants in this case as to whether they are guilty or innocent?

THE JUROR: No, sir.

. . . .

THE COURT: All right. Would you be willing to base your verdict, if you're a member of the jury, entirely on the evidence you hear and disregard any past reports or anything else?

THE JUROR: Yes.

THE COURT: Other than what comes out in the evidence?

THE JUROR: I'm sure I would.

THE COURT: Would you be fair and impartial and cast aside any other consid-

erations whatsoever in basing your verdict in this matter?

THE JUROR: I hope I would.

THE COURT: Do you have any doubt about it, that you would be fair and impartial?

THE JUROR: I would be as fair as I could be. I could be mistaken sometimes, but it would be an honest mistake.

THE COURT: You would be willing to follow the instructions of the court as to the law?

THE JUROR: Yes.

"[W]hen a defendant is trying to prove presumed bias, the court has the duty to develop the facts fully enough so that it can make an informed judgment." *Nell*, 526 F.2d at 1229. Here, each of the venire persons filled out a written questionnaire and was questioned specifically as to his or her responses by the court. In our opinion, the court's examination reproduced at length above illustrates that the court did conduct a thorough investigation into the attitudes and beliefs of the venirepersons and their qualifications and competency to sit at trial such that the district court could make an informed judgment as to whether these venirepersons should be excused for cause. Furthermore, we do not believe the court's examination revealed any actual prejudice on the part of these four jurors that would render any of them unfit to serve on the jury. Accordingly, we cannot conclude that the trial court abused its discretion either in conducting voir dire or in denying appellants challenges "for cause."

## VI

At trial, appellants objected to the testimony of Raymond Fatt based on Fed.R. Evid. 403 and requested the court to conduct a hearing under Fed.R.Evid. 104(a), apparently regarding Fatt's qualifications to testify. The district court overruled the objection and denied the request. Appellants contend on appeal that the "government's eyewitnesses did not meet the minimum standards of credibility and were therefore incompetent to testify." More specifically, appellants argue that "virtual-ly every purported eyewitness to the crime lied to F.B.I. agents, to defense investigators, to a grand jury, to prosecutors, and/or to defense attorneys" prior to trial and that "[t]he necessity of testifying from personal knowledge and truthfully ... were [sic] completely alien to these people, lending grave doubt as to their ability to relate events which actually transpired." In related arguments, appellants contend that "[t]he testimony proffered by the government witnesses was inconsistent with prior statements to the point of being irrelevant and should have been excluded" and that, even if the testimony can be considered relevant, "it was error to have it come into evidence because of its potential to prejudice and confuse the jury and surprise appellant." We address each argument in turn.

As a preliminary matter, we note that appellants' arguments on appeal do not appear to be limited to the testimony of Raymond Fatt alone, but instead are rather broadly stated and specifically point to the testimony of Boyd Atene as "[t]he worst ... in terms of the number and variety of false statements." However, our review of the record leaves us confident that the trial court considered and rejected the general substance of appellants' instant arguments as they relate to all of the government witnesses who had given prior inconsistent statements or perjured testimony.

The record also supplies us with a sufficient basis for reviewing the district court's reasoning in this regard. Appellants' many concerns regarding the credibility of the government's various witnesses were brought to the court's attention during pretrial discussions. In response to some of these concerns, the court held an extensive pretrial hearing on appellants' motions to dismiss the indictment and to suppress statements. Throughout the hearing, the court heard the testimony and cross-examination of several of the government's witnesses—including Boyd Atene, Julius Crank, Marie Haycock, and Raymond Fatt—concerning their various prior inconsistent statements and the reasons for the

variances. In denying both of appellants' motions, the district court concluded:

> Essentially, the problems with which we are here confronted relate to the credibility and reliability of witnesses. Our system takes that into account by providing for a jury trial. A trial jury is best situated to consider all of the facts and circumstances applicable to the credibility or believability of witnesses. That jury can observe the demeanor of the witness, take into account all of the factors which might bear upon whether or not the testimony of a particular witness is worthy of belief.

### A

 Appellants' argument as to competency suggests that at a certain point—when a witness has produced a certain number of prior inconsistent statements, and when those prior statements are even inconsistent with each other—the task of evaluating the credibility of the witness should be removed from the province of the jury and considered by the trial court under a competency analysis. Appellants base their argument in part on our discussion of the incompetency standard in *United States v. Gomez*, 807 F.2d 1523, 1527 (10th Cir.1986). However, as *Gomez* makes clear: "The credibility of the witness ... [is] for the jury to determine." *Id.* However, even if credibility considerations can properly be fit under a competency rubric, the district court has "broad discretion in determining the competency of a witness to testify, and [its] decision will not be reversed in the absence of an abuse of discretion." *Id.*

In that vein, we cannot conclude the district court abused its discretion in refusing to conduct a further hearing on the incompetency—or more accurately, incredibility—of the government's witnesses or in determining that the jury should properly weigh issues of credibility.

Fed.R.Evid. 601 provides that "[e]very person is competent to be a witness except as otherwise provided." "A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that [he] has personal knowledge of the matter." Fed.R.Evid. 602. However, "[e]vidence to prove personal knowledge may ... consist of the witness' own testimony." *Id.* Finally, Fed.R.Evid. 603 requires every witness "to declare that [he] will testify truthfully, by oath or affirmation."

Each of the government's key witnesses took the required oath. Haycock, Chee, Julius Crank, Fatt and Boyd Atene each testified that he or she had been at the bonfire party, and Boyd Atene testified to being present at the Copper Canyon scene when the panels were set on fire. All of these witnesses were exhaustively cross-examined in the presence of the jury both as to the substance of their prior inconsistent statements and their explanations therefor.

We consider appellants' suggested fusion of competency and credibility analysis to be regressive rather than progressive in relation to the evolution of the law in this area. The advisory committee's notes to Rule 601 state:

> No mental or moral qualifications for testifying as a witness are specified. Standards of mental capacity have proved elusive in actual application.... Discretion is regularly exercised in favor of allowing the testimony. A witness wholly without capacity is difficult to imagine. The question is one particularly suited to the jury as one of weight and credibility, subject to judicial authority to review the sufficiency of the evidence. Standards of moral qualification in practice consist essentially of evaluating a person's truthfulness in terms of his own answers about it.

(Citations omitted.) One commentator has observed, "The common law rules of incompetency have been undergoing a process of piecemeal revision by statutes for over a century, so that today most of the former grounds for excluding a witness altogether have been converted into mere grounds of impeaching his credibility." *McCormick on Evidence* § 61, at 155 (E.W. Cleary 3d ed. 1984). Even the most traditional bases for excluding a witness as incompetent—such as insanity or immaturity—are no

longer specifically preserved by a particular federal rule:

> There is no rule which excludes an insane person as such, or a child of any specified age, from testifying, but in each case the traditional test is whether the witness has intelligence enough to *make it worthwhile to hear him at all and* whether he feels a duty to tell the truth.... The major reason for disqualification of the persons mentioned in this section to take the stand is the judges' distrust of a jury's ability to assay the words of a small child or of a deranged person. Conceding the jury's deficiencies, the remedy of excluding such a witness, who may be the only person available who knows the facts, seems inept and primitive. Though the tribunal is unskilled, and the testimony difficult to weigh, it is still better to let the evidence come in for what it is worth, with cautionary instructions. Revised Uniform Rule of Evidence 601 and the first sentence of Federal Rule of Evidence 601 reflect the above and additional reasoning by providing every person is competent to be a witness unless otherwise provided in the rules. No exception is made for mental incapacity or immaturity. As already indicated, mental de-

rangement, where it affects the ability of the witness to observe, remember, and recount, may always be proved to attack credibility.

*Id.* § 62, at 156–57 (footnotes omitted).

Appellants' argument, in asserting that a witness can be so untrustworthy as to lack the fundamental capacity of a witness, is reminiscent of another era when "moral depravity" could form the basis for excluding a witness.[14]

There are two objections to any attempt to establish such an incapacity. The first is that in rational experience no class of persons can safely be asserted to be so thoroughly lacking in the sense of moral responsibility or so callous to the ordinary motives of veracity as not to tell the truth (as they see it) in a large or the larger proportion of instances; or, in more accurate analysis, no such defect, if it exists, can be so well ascertainable as to justify us in predicating it for the purpose of exclusion. The second reason is that, even if such a defect existed and were ascertainable, its operation would be so uncertain and elusive that any general rule of exclusion would be as likely in a given instance to exclude the truth as to exclude falsities. It is therefore

---

**14.** The manifestation of the moral capacity exclusion most analogous to appellants' argument in this case is the maxim *nemo turpitudinem suam allegans audiendus est* —a general principle of disqualification recognized in the 1600s and 1700s that was entirely repudiated by the 1800s. 2 Wigmore, *Evidence* §§ 525–527, at 735–39 (Chadbourn rev. 1979). As Wigmore explains, "The notion underlying the maxim is that a person who comes upon the stand to testify that he has at a former time spoken falsely or acted corruptly is by his very confession a liar or a villain, and therefore untrustworthy as a witness." *Id.* § 525, at 735. More specifically,

> [t]he argument was often urged, during the 1600s and 1700s, and appears to have been generally accepted by the judges, that one who came to the stand to testify that upon a former oath he had sworn falsely was as a self-confessed perjurer incapable of trust:
>
> *Oates' Trial,* 10 *How.St.Tr.* 1079, 1185 (1685). *Attorney–General: Pray* acquaint my lord and the jury how you came to swear at the former trial, by whom you were persuaded, and how you varied from the truth.

*L.C.J. Jeffreys:* I tell you truly, Mr. Attorney, it looks rank and fulsome. If he did forswear himself, why should he ever be a witness again? *Attorney–General:* 'Tis not the first time by twenty that such evidences have been given. *L.C.J. Jeffreys:* I hate such precedents in all times, let it be done never so often. Shall I believe a villain one word he says, when he owns that he forswore himself? ... What good will the admitting him to be a witness do? For either what he swore then or what he swears now is false; and if he once swears false, can you say he is to be believed? ... We are all of another opinion, that it is not evidence fit to be given. ... [T]his same argument of L.C.J. Jeffreys ... is unsound; the witness *may* be telling the truth now; whether he is doing so can best be left to the jury to consider under all the circumstances affecting his credit. To exclude one who now admits a former perjury, much more to exclude one who merely contradicts his former oath, is to shut out a possible source of truth; and to admit him can hardly serve to mislead, since the testimony is of itself open to suspicion.

*Id.* § 527, at 737–38 (emphasis in Wigmore).

not a proper foundation for a rule of exclusion.

2 Wigmore, *Evidence* § 515, at 721–22 (Chadbourn rev. 1979).

This court is confident that the Federal Rules of Evidence provide sufficient avenues by which a witness's credibility can be fully explored and tested in front of the jury, and we agree with the district court that the jury is still the best arbiter for such determinations. The court gave the jurors guidelines for assessing the credibility of witnesses, instructed them as to the purpose of the prior inconsistent statement testimony, and instructed that, based on the inconsistencies or discrepancies in a witness's testimony, they could "reject all the testimony of that witness or give it such credibility as you may think it deserves."

We are not inclined to resurrect judicial notions of moral capacity as a means for disqualifying a witness. The jury system has served us well. We would not serve it well by holding that jurors are incapable of making credibility determinations. Accordingly, we conclude that the district court did not abuse its discretion in allowing the government's principal witnesses to testify at trial.

### B

▮ Turning to appellants' relevancy argument, we first note that "a trial court has broad discretion to determine whether evidence is relevant, and its decision will not be reversed on appeal absent a showing of clear abuse of that discretion." *Hill v. Bache Halsey Stuart Shields Inc.*, 790 F.2d 817, 825 (10th Cir.1986). The advisory committee's note to Fed.R.Evid. 401 states that "[p]roblems of relevancy call for an answer to the question whether an item of evidence ... possesses sufficient probative value to justify receiving it in evidence." Appellants argue that "[b]ecause of the questionable credibility of the testimony of the government witnesses, there was no relation between that evidence and the matter to be proved in the case." We find no merit to this argument. All of the government's principal witnesses testified as to things they saw or heard on the night of December 4, 1987, or on the days immediately thereafter. These events were of the highest relevance to the trial. The district court did not abuse its discretion by so concluding. Again, in the search for truth at trial, questions of credibility are properly left to the jury.

### C

▮ Alternatively, appellants argue that "[i]f the testimony of the government witnesses is found to have been properly ruled relevant, it was error to have it come into evidence because of its potential to prejudice and confuse the jury and surprise appellant." A district court's determination under Fed.R.Evid. 403 that the probative value of evidence outweighs its potential to prejudice or confuse the jury is also reviewable only for an abuse of discretion. *Bache Halsey*, 790 F.2d at 825. Given the high probative value of the testimony of the government's key witnesses and appellants' opportunities, through rigorous cross-examination, to highlight for the jury specific instances of prior inconsistent testimony and statements, we cannot hold that the district court abused its discretion in allowing the government's key witnesses to testify over appellants' Rule 403 objection.

### VII

Finally, appellants argue the trial court erroneously admitted, over appellants' objection, the testimony of the principal of Monument Valley High School, Richard McMullin, as evidence of appellants' character for honesty. Appellants argue that McMullin "simply did not have an adequate foundation of knowledge regarding [appellants] to offer an opinion concerning [their] veracity" and that either Fed.R.Evid. 403 or 701 therefore precluded admission of McMullin's testimony. In attacking the principal's foundation of knowledge, appellants note that McMullin is Caucasian, he does not speak the Navajo language despite having lived among Navajos for many years, he lived with other white teachers in a compound set apart from the Navajos,

and his knowledge of appellants was restricted to school and school activities.

 Fed.R.Evid. 608(a) permits a party to attack the credibility of a witness by evidence in the form of opinion or reputation as to the witness's character for truthfulness or untruthfulness. The admission of this type of evidence is left to the sound discretion of the district court, which must also determine whether the evidence passes the Rule 403 balancing test. *United States v. Medical Therapy Sciences, Inc.*, 583 F.2d 36, 41 n. 6 (2d Cir.1978), *cert. denied*, 439 U.S. 1130, 99 S.Ct. 1049, 59 L.Ed.2d 91 (1979). In order to establish an appropriate foundation, a witness testifying under Rule 608(a) must show " 'such acquaintance with the [person under attack], the community in which he has lived and the circles in which he has moved, as to speak with authority of the terms in which generally he is regarded.' " *Cooper v. Asplundh Tree Expert Co.*, 836 F.2d 1544, 1552 (10th Cir.1988) (quoting *Michelson v. United States*, 335 U.S. 469, 478, 69 S.Ct. 213, 219, 93 L.Ed. 168 (1948)).

 Mr. McMullin testified, both out of the presence of the jury and again before the jury about the basis for his knowledge of appellants' reputation for truthfulness. Mr. McMullin was the principal of Monument Valley High School for three years. Monument Valley High School is the "focal point" for community activities. Mr. McMullin lived on the school compound, he regularly used the local trading post and used the local hospital, he knew appellants personally, and he had contact with appellants throughout the three-year period he resided in the community.

In our opinion, the above testimony establishes a proper foundation for Mr. McMullin's testimony as to appellants' character for truth and veracity. Since appellants had testified earlier, McMullin's testimony was admissible under Rule 608(a) and was probative of a matter at issue at trial, namely appellants' character as witnesses.[15] We do not view Mr. McMullin's inability to speak the Navajo language as crucial to his ability to form an opinion as to appellants' general reputation for character in the community—appellants and most of the other Navajo witnesses at trial could speak and understand English. Furthermore, we do not view the probative value of Mr. McMullin's testimony to be "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury," Fed.R.Evid. 403, simply because McMullin was a white witness testifying to an all-white jury about Navajo defendants. Accordingly, we find no indication in the record that the trial court abused its discretion in admitting Mr. McMullin's testimony.

Appellants' convictions are AFFIRMED.

---

15. The court properly instructed the jury that Mr. McMullin's testimony could be considered only in judging the credibility of appellants as witnesses.